1  KENNETH A. KUWAYTI (CA SBN 145384)
   KKuwayti@mofo.com
2  MORRISON & FOERSTER LLP
   755 Page Mill Road
3  Palo Alto, California  94304-1018
   Telephone: 650.813.5600
4  Facsimile: 650.494.0792

5  NICHOLAS RYLAN FUNG
   NFung@mofo.com
6  MORRISON & FOERSTER LLP
   707 Wilshire Boulevard
7  Los Angeles, California  90017-3543
   Telephone: 213.892.5200
8  Facsimile: 213.892.5454

9  Attorneys for Defendants
   NICHOLAS HORBACZEWSKI and DRONE
10 RACING LEAGUE, INC.

11                 UNITED STATES DISTRICT COURT

12                CENTRAL DISTRICT OF CALIFORNIA

13                       WESTERN DIVISION

14

15

| | |
|---|---|
| JUSTICE LAUB and DANIEL KANES, | Case No. 2:17-CV-06210 JAK (KSx) |
| Plaintiffs, | **NICHOLAS HORBACZEWSKI COUNTERCLAIM AGAINST DANIEL KANES** |
| v. | |
| NICHOLAS HORBACZEWSKI, DRONE RACING LEAGUE, INC., and DOES 1 TO 10, | Hon. John A. Kronstadt |
| Defendants. | |
| NICHOLAS HORBACZEWSKI, | **JURY TRIAL DEMANDED** |
| Counter-Claimant, | |
| v. | |
| DANIEL KANES, | |
| Counter-Defendant. | |

16
17
18
19
20
21
22
23
24
25
26
27
28

Nicholas Horbaczewski submits the following Counterclaim against Daniel Kanes:

### NATURE OF ACTION

1. Drone Racing League ("DRL") is a private company and the premier drone racing league with events broadcast worldwide. A sports and media company, DRL combines world-class pilots, iconic locations, and proprietary technology to create engaging drone racing content with mass appeal. Nick Horbaczewski is the sole founder and CEO of DRL.

2. In June of 2017 DRL announced publicly that it had completed a $20 million round of funding. Mr. Kanes and Justice Laub, who had never made such a claim previously, are now contending that they have a contract that makes them each owners of one-third of DRL.

3. Mr. Horbaczewski learned, shortly after Plaintiffs served their responses to Defendants' First Set of Interrogatories on September 17, 2018, that Mr. Kanes had edited the Wikipedia page for the Drone Racing League to falsely claim that Plaintiffs were co-founders of the DRL and were the creators of the concept of the DRL, and linked to an article in law.com that repeated Plaintiffs' false claims that Mr. Horbaczewski had stolen their ideas and agreed to provide them each with one-third ownership of the company.

4. Mr. Horbaczewski brings this action for damages for tarnishing his reputation and an injunction preventing Mr. Kanes from continuing to make these same false claims.

### THE PARTIES

5. Nicholas Horbaczewski is the founder and CEO of DRL and a resident of New York, New York.

6. Before founding DRL, Mr. Horbaczewski was a member of the executive team at Tough Mudder, Inc., which puts on a well-known series of extreme obstacle course and endurance event challenges that have attracted over

two million people worldwide.  While at Tough Mudder, Mr. Horbaczewski had responsibility for, among other things, developing and executing the company's marketing and revenue strategy, Tough Mudder's sponsorships, partnerships, merchandise and licensing, and the company's worldwide revenue generation.  Mr. Horbaczewski also co-founded the independent film production company Leeden Media.  He has an MBA from Harvard Business School.

7.    As pled in the Third Amended Complaint, Daniel Kanes is an individual residing in Santa Clarita, California.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) because Mr. Horbaczewski's claims are related to the claims in the Third Amended Complaint.

9.    Mr. Kanes is subject to personal jurisdiction in this District because he resides in this District and he has subjected himself to the jurisdiction of this Court in this case by filing the Third Amended Complaint.

10.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) to the extent that Plaintiffs' action remains in this Court because Mr. Kanes resides in this District and by virtue of Plaintiffs' filing of this action in this Court.

## STATEMENT OF FACTS

**The Origins of Drone Racing**

11.    On information and belief, the first drone races occurred in 2010 in Australia.  By early 2014 there was an extensive international hobbyist community of racing drone owners and drone racing enthusiasts, including official racing organizations in the Australian provinces of Queensland, Victoria, and Tasmania.

12.    On information and belief, starting around 2014, several for profit companies started to organize drone races for broadcast and live audiences featuring substantial cash prizes or payment for pilots.  These companies included:

- Airgonay, a French quadcopter racing association that began organizing and broadcasting races in September 2014.
- AerialGP, a California company founded in 2014, which began holding races in August 2014. By early 2015 AerialGP had established at least ten active country-based chapters which organized over 30 international drone races in 2015.
- DroneKraft, a New York company founded in 2014, which was working to develop professional drone racing and the technology required for it. DroneKraft designed and built drone racing models and other drone racing technology and hosted or sponsored races in Canada and the U.S. in early 2015.
- The Drone Sports Association, a California company founded in January 2014 (initially under the name Rotorsports), organized a global series of races throughout 2014 and 2015 as qualifiers for the first ever US National Drone Racing Championship held in July of 2015 at the California State Fair.
- FPV Canada, formerly FPV Montreal, was founded in late 2014, creating a multi-group racing league with franchise locations in most major cities in Canada.
- Multi-GP, a Florida company founded in January of 2015, which was holding organized races throughout central Florida by February 2015, and grew quickly to become the largest drone racing organization in the world from a participation standpoint. By the end of 2016 it had dozens of chapters, and claimed over 20,000 registered members.

**Mr. Horbaczewski's Initial Meetings with Mr. Kanes and Mr. Laub**

13. Mr. Horbaczewski resigned his position as Senior Vice President Revenue and Business Development of Tough Mudder in January 2015 to start his own business. On January 22, 2015, during a trip to Los Angeles, Mr.

Horbaczewski had lunch with Matthew Mazzeo, a friend from college and venture capitalist. Mr. Mazzeo invited Mr. Laub—a friend of Mr. Kanes—to the lunch and introduced him to Mr. Horbaczewski.

14. That same day Mr. Horbaczewski met Mr. Kanes. Mr. Horbaczewski, Mr. Kanes and Mr. Laub discussed drone racing. Mr. Horbaczewski learned that Mr. Kanes was the co-founder of a video transmission company called Paralinx that manufactures a wireless HD video product that was developed for, among other uses, applications in the drone industry. Mr. Laub did not have any business background, but claimed to be active in marketing and social media and to have connections in the entertainment industry. Mr. Laub did not have any particular expertise related to drones or drone racing.

15. After meeting Mr. Laub and Mr. Kanes, Mr. Horbaczewski returned to New York, and over the next few months researched drone racing, as well as other business opportunities. Mr. Horbaczewski was looking to start his own business, but he was not committed to any particular business at this time. Drone racing was only one of several ideas he was considering and developing.

16. As part of his research of drone racing, Mr. Horbaczewski met and had discussions with several individuals with knowledge of the industry. One of these people was Ryan Gury, who Mr. Horbaczewski met in or around early March 2015. Mr. Gury had co-founded DroneKraft in August 2014 which, as noted above, designed and manufactured racing drones, and was attempting to develop and professionalize drone racing. Mr. Gury was active in the nascent drone racing market and by the time of his meeting with Mr. Horbaczewski, DroneKraft had already been in operation for eight months. It had developed a drone racing model that was already selling to hundreds of drone racers around the world, and had sponsored or hosted drone races in the U.S. and Canada. The company had also pitched the idea of professional drone racing as a spectator sport to potential investors and had engaged in months of planning about how to overcome the

1   challenges involved with that and how to make the sport entertaining.  Before

2   meeting Mr. Horbaczewski, Mr. Gury and DroneKraft had already developed a

3   racing drone that could be disassembled and reassembled easily for transport and

4   developed solutions to reduce interference between control signals going to

5   multiple racing drones and to compensate for control signals improperly reflecting

6   off of metal surfaces.

7          17.    Mr. Horbaczewski learned a great deal about the drone industry from

8   Mr. Gury.  The two of them corresponded extensively about creating a drone racing

9   company.  Mr. Horbaczewski met with the co-founder of DroneKraft, Trevor

10  Smith, as well.  One of DRL's first acts, on May 1, 2015, shortly after the company

11  was formed, was to acquire DroneKraft.  Mr. Gury is currently Director of Product

12  at DRL.  Mr. Smith is the Head of Technical Operations at DRL.

13         18.    After their January 2015 meeting, Mr. Horbaczewski also

14  corresponded with Mr. Laub and Mr. Kanes about a potential drone racing

15  company, but these discussions were preliminary, and Mr. Horbaczewski never

16  promised Mr. Kanes or Mr. Laub equity or equity options in any such company.

17         19.    The parties met in Los Angeles in or about March 2015—in what was

18  just their second in-person meeting.  At that meeting Mr. Horbaczewski informed

19  Mr. Kanes and Mr. Laub that he had met Mr. Gury and that if he pursued a business

20  in drone racing he would be financing it on his own, as the sole founder.

21         20.    Mr. Horbaczewski never agreed or promised then or at any other time

22  that Mr. Kanes or Mr. Laub would each be provided with a one-third ownership in

23  the DRL.  Mr. Kanes and Mr. Laub also never made once claimed, either orally or

24  in writing, to Mr. Horbaczewski or anyone at the DRL that they each held a one-

25  third ownership interest in the DRL until attorneys for Mr. Laub sent a demand

26  letter over two years later, on June 30, 2017, immediately prior to Mr. Laub filing

27  this lawsuit.  The first time that Mr. Kanes ever claimed that he owned a one-third

28

NICHOLAS HORBACZEWSKI'S COUNTERCLAIM AGAINST DANIEL KANES

CASE NO. 2:17-CV-06210 JAK (KSx)

pa-1873792

1  interest in the DRL was when he joined as a plaintiff in the First Amended

2  Complaint in this action, which was not filed until September 27, 2017.

3      21.    Further, Plaintiffs' actions and documents that they themselves

4  authored squarely contradict their claim now that they believed that they each

5  owned a one-third interest in the DRL.  Plaintiffs were each provided with the

6  opportunity to obtain a much smaller equity stake in the company either by working

7  for the company or investing in it.  Plaintiffs did not take those opportunities, and

8  did not claim in response that they were already co-founders who owned a one-third

9  interest.

10 **Mr. Laub Is Offered The Chance To Earn A 1% Stake in DRL As A Marketing Consultant**

11

12     22.    Mr. Laub told Mr. Horbaczewski that he did not have any money to

13 invest in DRL.  During a telephone call in May 2015, Mr. Laub proposed that he be

14 given the opportunity to earn a 1% stake in the company in exchange for working

15 as a marketing consultant for Mr. Horbaczewski's New York company.

16     23.    On June 1, 2015, in response to Mr. Laub's proposal, Mr.

17 Horbaczewski sent Mr. Laub an email attaching a proposed Independent Contractor

18 Agreement that set forth the terms of the proposed consulting agreement. Under the

19 terms of the proposed consulting agreement, among other things, Mr. Laub would

20 not receive any compensation other than as stated in the agreement, and was

21 required to broadly assign all inventions, innovations and know-how developed

22 during the consulting period to DRL. The consulting agreement provided that the

23 1% equity interest would vest over a four year period beginning May 1, 2015.

24     24.    In an email dated June 2, 2015, Mr. Laub responded: "Thank you for

25 getting it to me. I'm excited to be an adviser and be vested 1% of the company like

26 we discussed on the phone that seemed fair." Mr. Laub stated that he would send

27 the proposed agreement to his lawyer and put him in touch with Mr. Horbaczewski.

28

1   But Mr. Horbaczewski never heard from Mr. Laub's lawyer, and Mr. Laub would
2   not respond to the proposed consulting agreement for another five months.

3          25.    In a November 23, 2015 email, when Mr. Laub finally responded
4   further to the June 1, 2015 marketing consultant proposal. Mr. Laub stated that he
5   wanted to sign the agreement, but wanted clarification that the shares that he would
6   receive "represent 1% of the company vested to me over the 4 years like we
7   discussed." He concluded the email by stating, "I know you have been really busy
8   but if you can spare some time just so I know this is fair & covers the 1% we had
9   agreed on before – that would be cool." During the intervening five months,
10  however, DRL had already hired marketing employees and established itself, and
11  no longer had any need for Mr. Laub's consulting services. The consulting
12  agreement was never executed, and Mr. Laub did not perform any marketing
13  services for DRL to earn the 1% vesting share.

14         26.    Significantly, in responding to this proposal, Mr. Laub never once
15  claimed that he already owned one-third of the DRL as a co-founder.  To the
16  contrary, he characterized the proposal as "fair" and "what we had agreed on."

17  **Mr. Kanes Declines To Invest In DRL**

18         27.    Unlike Mr. Laub, Mr. Kanes did claim to have money to invest in
19  DRL.  But Mr. Kanes had a problem.  In February 2015, in connection with the sale
20  of his company Paralinx LLC ("Paralinx") to Teradek LLC ("Teradek"), Mr. Kanes
21  had entered into a non-compete agreement, which precluded him from working in
22  the area of wireless video devices.

23         28.    Mr. Kanes provided Mr. Horbaczewski with a copy of this non-
24  compete agreement for the first time on or about April 9, 2015.  He told Mr.
25  Horbaczewski that the agreement precluded him from working for the type of drone
26  racing company that the parties had been discussing.  The agreement also precluded
27  Mr. Kanes from investing in, or being an owner of, such a business.

28

29.     More specifically, the noncompete provision in the Asset Purchase Agreement between Teradek and Paralinx, to which Mr. Kanes is personally a party, states the following:

> For a period of five (5) years from and after the Closing, each Beneficiary severally, but not jointly, agrees that he shall not engage in any business, whether as owner, officer, director, consultant, partner or otherwise, that competes with the Business as currently conducted as of the Closing, provided, however, that this Section 6.3(a) shall not apply to the ownership by any Beneficiary of not more than one percent (1%) of the shares of a publicly held corporation or owned indirectly through a publicly held mutual fund.

(Asset Purchase Agreement § 6.3(a).)

30.     Mr. Kanes is a defined Beneficiary under the Asset Purchase Agreement.  The "Business" is defined as "the business engaged in by Seller of designing, manufacturing, marketing and distributing wireless video devices." (Asset Purchase Agreement, Definitions.)  The date of the Agreement was February 27, 2015.

31.     Mr. Kanes's employment agreement with Teradek ("Employment Agreement"), also dated February 27, 2015, also contains a non-compete clause which states:

> **Covenant Not to Compete.** Employee promises that during his employment with Employer, he shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, corporate officer, board member, director, or in any other individual or representative capacity, engage or attempt to engage in any competitive activity relating to the subject matter of his employment with Employer or relating to Employer's line of business.

32.     Further, with the limited exception for approved cinematography assignments, the Agreement precludes Mr. Kanes from taking on any business activity that would interfere with his Teradek duties.  It provides that, "Employee shall, while this Agreement is in effect, devote his working or business time,

1  attention, knowledge and skills faithfully and to the best of his ability, to the duties
2  and responsibilities of his position in furtherance of the business, affairs and
3  activities of Employer and its subsidiaries, affiliates and strategic partners, and shall
4  not, without Employer's prior written consent, render to others services of any kind
5  for compensation, or engage in any other business activity that would interfere with
6  the performance of his duties under this Agreement." Employment Agreement
7  § 2.2.

8      33.    On information and belief, Teradek is in the business of developing
9  solutions for streaming high definition video over local networks.  Teradek's
10  business is similar in nature to DRL in that DRL streams live video from racing
11  drones to a server for display at a live event, live streaming over the internet, or to
12  be saved and edited for broadcast later.

13  **Mr. Kanes Declines the Opportunity To Invest In DRL**

14      34.    Over the next several months Mr. Horbaczewski continued to explore
15  whether there was some way for Mr. Kanes to either work for, or invest in, DRL.
16  Mr. Horbaczewski told Mr. Kanes that if Mr. Kanes could obtain written
17  permission from Teradek, he would like to have Mr. Kanes become an employee of
18  DRL, and also offered him the opportunity to invest in DRL's initial round of
19  financing on the same financial terms as Mr. Horbaczewski.

20      35.    In view of his non-compete agreement, Mr. Kanes stated that he
21  preferred to invest in DRL rather than work for the company.  The parties
22  exchanged detailed documentation pertaining to a potential $250,000 investment by
23  Mr. Kanes in DRL, including a capitalization table for the company.  At no time
24  during any of these communications did Mr. Kanes claim that he already owned
25  one-third of DRL.

26      36.    Mr. Kanes tried to circumvent the provisions of his non-compete
27  agreement with Teradek, and attempted to persuade Mr. Horbaczewski at a meeting
28  in or around June of 2015 to allow Mr. Kanes to make the $250,000 investment in

DRL through a trust that he would form, and possibly set up overseas.  Mr. Horbaczewski told Mr. Kanes that he wanted his investment, but that the non-compete issue would need to be properly addressed by obtaining Teradek's permission.  Mr. Kanes agreed at the end of the meeting that he would go to Teradek and obtain Teradek's permission to make the investment.  But he never did.

37.    Mr. Horbaczewski next met with Mr. Kanes in person at a DRL event on July 11, 2015 in Yonkers, New York.  Mr. Kanes travelled to New York to attend the event, and at this point was still stating that he intended to make the $250,000 investment in the company.  Mr. Kanes again did not make any claim that he already had an ownership interest in DRL while he was in New York.

38.    Mr. Horbaczewski sent Mr. Kanes the final investment documents on August 19, 2015.  But Mr. Kanes ultimately decided not to invest, apologizing, and stating that he had "other financial commitments."  Specifically, in an email dated August 24, 2015, Mr. Kanes wrote to Mr. Horbaczewski explaining:

> Unfortunately I think I'm going to have to dip out on this one.
>
> I have some other financial commitments I have to take care of at this time, and I definitely don't want to hold up your progress.
>
> Can't wait to see the first film, and I have to grab an LA times as my parents said they saw an Article on DRL in the business section!
>
> Exciting times!
>
> Let's keep in touch, and again, I apologize but I don't want to slow down the round especially if it's already oversubscribed.

39.    Mr. Kanes then stood by while DRL's initial round of financing was completed without his participation, never informing Mr. Horbaczewski or anyone at DRL that he believed he already owned a one-third share of the company.

**Events Leading Up To This Lawsuit**

40.   On June 11, 2017, DRL announced that it had completed a round of funding in which it received $20 million in a private placement led by a number of significant telecommunications and media companies.

41.   On September 27, 2017 Mr. Kanes joined an existing lawsuit pending in California federal court filed by Mr. Laub, and for the first time Defendants learned that Mr. Kanes is claiming that he holds a one-third ownership interest in DRL.

42.   Mr. Kanes had never made this claim to DRL or Mr. Horbaczewski before.  To the contrary, Mr. Kanes had previously made many statements that were supportive of DRL, both to Mr. Horbaczewski and publicly, without suggesting that he held a one-third ownership interest.

43.   For example, Mr. Horbaczewski encountered Mr. Kanes at the Consumer Electronics Show, a large trade show in the technology industry, in Las Vegas in January 2016.  Mr. Kanes congratulated Mr. Horbaczewski on DRL's progress.  Mr. Kanes did not raise the issue of an ownership interest in DRL at this event.

44.   On November 27, 2016 after DRL's ESPN debut, Mr. Kanes posted on a forum for users of high end cameras: "If they [DRL] can get the aesthetic I'm envisioning nailed down, make it relatable enough, and celebrate the pilots and community right it could be as big as NASCAR or Formula 1."

45.   Mr. Kanes sent an email to Mr. Horbaczewski on April 6, 2017 congratulating him on the launch of a new racing drone and offering to demonstrate a new product produced by a company that he wanted to sell to DRL.  Mr. Kanes's April 6, 2017 email stated:

> Congrats on the launch of the Racer 3 !
> Looks cool.

Next time you're in LA I'd love to demo something for you.

I'll pull no punches and not waste your time – it's a concept and a piece of software that I've designed that I'd like to sell to DRL, and if you want me to, I'd like to help you on fully productizing my new concept.

Let me know !

Best,

Dan

46. Nowhere in this message did Mr. Kanes indicate that he had a one-third ownership interest in DRL that DRL had neglected to provide to him, or any relationship to DRL other than a desire to sell products or his company to it.

**Mr. Kanes' Defamatory Statements After Filing This Lawsuit**

47. In or around March 2018, Mr. Horbaczewski discovered that the Wikipedia entry for the Drone Racing League had been modified to include false information about him and the founding of DRL, contending that he stole the idea for the company from Mr. Laub and Mr. Kanes.  Instead of naming Mr. Horbaczewski as the sole founder of DRL, the History section of the Wikipedia entry stated:

> The Drone Racing League was founded by Nicholas Horbaczewski, who previously served as the Chief Revenue Officer at Tough Mudder, Dan Kanes who wrote and created the original concept, and Justice Laub who had done business and marketing development.[5]
>
> Horbaczewski first heard of the concept of Drone Racing League from Dan Kanes, who had written a detailed pitch deck for the league, and Justice Laub who Dan had partnered with for Business development of his original concept in January 2015.[6]

A copy of the Wikipedia entry for Drone Racing League containing this language is attached as Exhibit A.  Footnote six to the new entry, which was itself new, links the reader to an article on Law.com entitled "Drone Racing League Was Our Idea,

Tech Enthusiasts Say."  A copy of the article is attached as Exhibit B.  The sub headline of the article recounts a theme from Plaintiffs' lawsuit, that Mr. Horbaczewski "stole the idea to create a 'Nascar for the gaming generation.'"

48.     The linked article states further that Mr. Kanes and Mr. Laub accuse Mr. Horbaczewski of "secretly cutting them out of the company," and that "[t]he truth was that Horbaczewski intended to steal plaintiffs' ideas and the entire DRL for himself."  It further states that Mr. Kanes and Mr. Laub call this "a cynical plot to steal their ideas for a televised drone racing league, claim all the credit for himself, and cheat them out of their rightful ownership of two-thirds of the Drone Racing League." *See* Ex. B.

49.     Defendants served discovery requests on March 28, 2017, asking Mr. Kanes to produce "All documents relating to the Wikipedia entry for DRL, or any modification of the Wikipedia entry for DRL." (Request for Production 28) Defendants further asked Mr. Kanes to produce "All documents relating to any public statement by you relating to DRL or Mr. Horbaczewski, including but not limited to whether or not you or Mr. Laub were, or were promised that you or Mr. Laub would be cofounders."  (Request for Production 27).  In response to both requests Mr. Kanes said that he would produce "non-privileged documents responsive to this request to the extent any exist and are located during a reasonable search."  However, Mr. Kanes never produced any documents relating to the modification of the Wikipedia entry for DRL.

50.     Defendants' counsel also asked Plaintiffs' counsel whether Mr. Laub or Mr. Kanes had modified the Wikipedia page and asked them to change it back. Plaintiffs' counsel said that they were not aware of such a modification but would look into it and get back to Defendants' counsel.  They never did.

51.     Mr. Kanes only final admitted to modifying the Wikipedia entry in response to interrogatories served in this action on July 25, 2017.  Plaintiffs responded to the interrogatories on September 17, 2017, admitting that Mr. Kanes

1  "edited the Wikipedia entry for the Drone Racing League to reflect that the

2  founders of the DRL were Nicholas Horbaczewski, Dan Kanes, and Justice Laub."

3  Mr. Kanes never withdrew his modifications however.

4          52.    The false entry remained on Wikipedia until August 30, 2018, when

5  the defamatory statements were removed by Wikipedia.

6          53.    According to the Wikipedia page view analysis, the Drone Racing

7  League Wikipedia entry received over 12,000 page views between January 27,

8  2018, when the false entry was made by Mr. Kanes, and August 30, 2018.

9

10                              **FIRST CLAIM FOR RELIEF**

11                                  **(Defamation Per Se)**

12         54.    Mr. Horbaczewski repeats and realleges each allegation set forth in

13  paragraphs 1 through 53 above as if fully set forth herein.

14         55.    As described above, Mr. Kanes edited the Wikipedia entry for the

15  Drone Racing League as described above, to state that he and Mr. Laub were co-

16  founders of DRL, that Mr. Kanes "wrote and created the original concept" for DRL,

17  and that "Horbaczewski first heard of the concept of Drone Racing League from

18  Dan Kanes, who had written a detailed pitch deck for the league." A copy of the

19  Wikipedia entry for Drone Racing League containing this language is attached as

20  Exhibit A.

21         56.    These statements were false, and Mr. Kanes knew or reasonably

22  should have known that the statements were false.  Mr. Kanes deliberately linked

23  these statements via a footnote to an article on law.com about this lawsuit which, as

24  described above and in Exhibit B includes Plaintiffs' accusations that Mr.

25  Horbaczewski was "secretly cutting them out of the company," "intended to steal

26  plaintiffs' ideas and the entire DRL for himself," and engaged in "a cynical plot to

27  steal their ideas for a televised drone racing league, claim all the credit for himself,

28

1   and cheat them out of their rightful ownership of two-thirds of the Drone Racing

2   League." *See* Ex. B.

3        57.    Mr. Kanes knew or should have known that disseminating such

4   misinformation would cause readers to believe that Mr. Horbaczewski is lying

5   about founding DRL by himself and that he stole the concept for DRL from

6   Plaintiffs and cheated them out of an ownership share, none of which is true.  These

7   defamatory statements have caused harm to Mr. Horbaczewski's reputation.

8        58.    Wikipedia is one of the most popular websites in the world with page

9   views every month reported to be in the billions.  According to the Wikipedia page

10  view analysis, the Drone Racing League Wikipedia entry received over 12,000 page

11  views between January 27, 2018, when the false entry was made by Mr. Kanes, and

12  August 30, 2018.

13       59.    Further, a search on Google for "Drone Racing League" at the time

14  this Counterclaim was filed shows that the Wikipedia entry is the fourth entry

15  generated by the search.

16       60.    Mr. Kanes acted with malice when he published these statements on

17  Wikipedia.  He knew that the statements were false and acted with reckless

18  disregard as to their falsity, and was motivated by ill will in publishing them,

19  hoping to damage Mr. Horbaczewski's reputation.

20       61.    Mr. Horbaczewski seeks the recovery of damages sufficient to

21  compensate for the harm to his reputation.

22       62.    Mr. Horbaczewski additionally seeks an injunction prohibiting Mr.

23  Kanes from further disseminating defamatory statements that are similar to the ones

24  that he made when modifying the DRL Wikipedia entry.

25       63.    Further, because Mr. Kanes' acts were deliberately committed with

26  malice, fraud, and oppression, Mr. Horbaczewski seeks punitive damages.

27                                  **PRAYER FOR RELIEF**

28       WHEREFORE, Mr. Horbaczewski prays for the following relief:

1.      Judgment in favor of Mr. Horbaczewski and against Mr. Kanes.

2.      Damages in an amount sufficient to compensate Mr. Horbaczewski for harm to his reputation;

3.      Punitive damages;

4.      An injunction precluding Mr. Kanes from making further defamatory statements similar in nature to those alleged in the Counterclaim;

5.      Pre- and post-judgment interest on damages awarded on the Counterclaim to the extent permitted by law;

6.      Costs of suit; and

7.      Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Mr. Horbaczewski hereby demands a trial by jury on all issues upon which trial by jury may be had.


Dated:     November 19, 2018          KENNETH A. KUWAYTI
                                      NICHOLAS RYLAN FUNG
                                      MORRISON & FOERSTER LLP


                                      By:  _/s/ Kenneth A. Kuwayti_
                                           Kenneth A. Kuwayti

                                      Attorneys for Defendants
                                      NICHOLAS HORBACZEWSKI
                                      AND DRONE RACING LEAGUE,
                                      INC.