PATRICK M. RYAN (SBN 203215)
 *pryan@bartkolaw.com*
STEPHEN C. STEINBERG (SBN 230656)
 *ssteinberg@bartkolaw.com*
CHAD E. DEVEAUX (SBN 215482)
 *cdeveaux@bartkolaw.com*
BARTKO LLP
One Embarcadero Center, Suite 800
San Francisco, California 94111
Telephone:   (415) 956-1900
Facsimile:   (415) 956-1152

Attorneys for Plaintiffs
JUSTICE LAUB and DAN KANES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| JUSTICE LAUB and DAN KANES, | Case No. 2:17-cv-06210-JAK (KSx) |
| Plaintiffs, | **NOTICE OF SUPPLEMENTAL AUTHORITY** |
| v. | |
| NICHOLAS HORBACZEWSKI, DRONE RACING LEAGUE, INC., and DOES 1 TO 10, | |
| Defendants. | Action Filed:  July 10, 2017 Trial Date: None Set |
| AND RELATED COUNTER-CLAIM | Hon. John A. Kronstadt |

## I.    INTRODUCTION

Plaintiffs Justice Laub and Dan Kanes (collectively "Plaintiffs"), submit this Notice of Supplemental Authority to alert the Court to a recent landmark decision from California's Court of Appeal, *Shah v. Skillz Inc.*, 101 Cal. App. 5th 285, 320 Cal.Rptr.3d 175 (2024) (subsequent citations are to the Cal. Rptr. because Cal. App. pagination is not yet available),[1] that directly supports Plaintiffs' Opposition to Defendants' Motion to Exclude the Expert Report and Testimony of Greg J. Regan ("Motion to Exclude Regan") (Dkt. 305).

## I.    LEGAL STANDARD

Briefing closed on Defendants' Motion to Exclude Regan on June 24, 2019.[2] *See* Dkt. 315. But as Judge Birotte has noted, "[i]t is common practice in this district for parties to file" a "Notice of Supplemental Authority … informing the Court of a decision" decided "after briefing on [a] [m]otion" that addressed "similar issues." *Bugiel v. Ford Motor Co.*, No. 2:18-CV-06286-AB-FFM, 2022 WL 17486358, at *2 (C.D. Cal. Dec. 6, 2022). For example, in *XR Commc'ns, LLC v. D-Link Sys., Inc.*, No. SA CV 17-00596-DOC-JDE, 2022 WL 2291747 (C.D. Cal. April 18, 2022), Judge Carter accepted the plaintiff's "notices of supplemental authority" addressing "two decisions handed down by the Federal Circuit" after the close of briefing, found the plaintiff's "reading of the … Federal Circuit authorities … persuasive,"

---

[1] A true and correct copy of the *Shah* decision is attached hereto as **Exhibit 1**.

[2] In addition to Defendants' Motion to Exclude Regan, the following motions, which were all fully briefed and argued in 2019, remain pending before the Court: (1) Plaintiffs' Motion for Partial Summary Judgment (Dkt. 194); (2) Plaintiffs' Motion to Exclude Parks (Dkt. 228); (3) Plaintiffs' Motion to Exclude Cumming (Dkt. 229); (4) Plaintiffs' Motion to Exclude Schoettelkotte (Dkt. 230); (5) Defendants' Motion for Summary Judgment (Dkt. 234); (6) Plaintiff Dan Kanes's Motion for Attorneys' Fees from his successful Special anti-SLAPP Motion ("anti-SLAPP Fees Motion") (Dkt. 358); and (7) Plaintiffs' Conditional Motion for Certification of Interlocutory Appeal for the Purpose of Certifying a Question to the California Supreme Court ("Motion for Certification") (Dkt. 371).

and granted plaintiff's requested relief based on those authorities. *Id.* at \*4. As Judge O'Connell explained, a "Notice of Supplemental Authority" on a case decided after the close of briefing on a motion should "summarize the case, explain why th[e] Court should consider th[e] case," and "describe how it applies to the instant case." *Resnick v. Hyundai Motor Am., Inc.*, No. CV 16-00593-BRO (PJWx), 2017 WL 6549931, at \*14 n.7 (C.D. Cal. Aug. 21, 2017); *accord Bugiel*, 2022 WL 17486358, at \*2 ("Notice of Supplemental Authority" should explain the relevance of the new authority by "reasonably draw[ing] th[e] Court's attention to the relevant sections of the [new] order").

## II.    ANALYSIS

### A.    *Shah* Is Binding in this Case.

*Shah* conclusively shows that Defendants' Motion to Exclude Mr. Regan must be denied. *Shah* addressed a question that it recognized no prior California decision ever previously had "occasion to consider"—what "valuation date" should be used to calculate "the measure of damages for breach of a contract to … [convey] stock" in "a startup company" when "there was no available market for the stock at the time of … [the] breach[?]" 320 Cal. Rptr. 3d at 188-189, 191-92. *Shah* held, under both California and Delaware law,[3] that the proper measure of damages in such cases is "the 'highest intermediate price' of the defendant's stock" between the "date of breach" and the first date when a "readily available market" exists. *Id.* at 192-193, 196. This occurs when the startup "undergo[es] an initial public offering (IPO)" or "is sold to another company." *Id.* at 180 and n.1.

---

[3] In *Shah*, "both parties assumed [at trial] that California law controlled, and neither argued that Delaware law governed the measure of damages. But in its [appellate] reply brief, Skillz asserted for the first time that Delaware law governed the measure of damages" because the parties' stock purchase agreement contained a Delaware choice-of-law provision. 320 Cal.Rptr.3d at 187. The court held that whether California law or Delaware law applies "makes no difference here" because the relevant law of both States is identical. *Id.*

1    The Court heard Defendants' Motion to Exclude Mr. Regan on July 15, 2019.

2    Dkt. 259. Defendants argued that Mr. Regan's testimony and report must be stricken

3    because they address the value of DRL stock "years after the alleged breach [of the

4    contract] at issue in this case." Dkt. 225-1 at 6:13-15. Defendants argued that this

5    was improper based on their representation that "[u]nder longstanding California

6    law, damages for a breach of contract are measured from the date of the alleged

7    breach." *Id.* at 6:18-25. Defendants later incorporated this argument by reference

8    into their opposition to Plaintiff's motion to compel further discovery responses that

9    were aimed at determining the present value of DRL stock in 2019. Dkt. 488 at

10   39:15-19. Judge Stevenson sided with Defendants, denying Plaintiff's requested

11   discovery because, in the Court's view, "damages for breach of contract … must be

12   measured as of the date of the alleged breach." *Laub v. Horbaczewski*, 2020 WL

13   7978227, at *8 (C.D. Cal. Nov. 17, 2020).

14   But *Shah* shows that both Defendants' argument to the Court in support of

15   their Motion to Exclude Regan and Judge Stevenson's order adopting their

16   reading—that under California law, "damages for a breach of contract" must *always*

17   be "measured from the date of the alleged breach"—are flatly wrong. *See id.*; Dkt.

18   225-1 at 6:18-25. Defendants argued to both this Court and Judge Stevenson that

19   *First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058 (9th Cir. 2011)

20   mandated this rigid reading. Dkt. 225-1 at 6:18-25; *see also* Dkt. 488 at 39:15-19. In

21   *First Nat'l*, the Ninth Circuit adopted the district court's holding that damages must

22   always be measured at the time of the breach because "permitting a plaintiff's after-

23   the-fact assertion that he would have sold stock at a time that, in hindsight, would

24   have been particularly advantageous would permit the plaintiff to receive more than

25   the benefit of his bargain." *First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*, 2005 WL

26   2206698, at *5 (N.D. Cal. Sept. 12, 2005) (quotations omitted), *aff'd by* 631 F.3d

27   1058, 1070 (9th Cir. 2011).

28   But the *Shah* court held that "we do not find [*First Nat'l*] persuasive" because

1  it ignores California's "fundamental principles of contract damages." *Shah*, 320
2  Cal.Rptr.3d at 189 n.17. This is because when a defendant breaches its contract to
3  convey shares in a startup before they have an established market value, it is "[t]he
4  defendant's acts," not the plaintiff's, that "prevent[ed] [the] court from determining
5  with any degree of certainty what the plaintiff would have done with his securities
6  had they been freely alienable." *Id.* at 195 (citations omitted). Thus, "fundamental
7  justice requires that, as between [the plaintiff] and [the defendant], the perils of such
8  uncertainty should be laid at [the] defendant's door." *Id.* (citations omitted).

9       It is settled doctrine under *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), that a
10 Ninth Circuit decision construing California law is "only binding" on lower federal
11 courts "in the absence of any subsequent indication from the California courts that
12 [the Ninth Circuit's] interpretation was incorrect." *Owen by & through Owen v.*
13 *U.S.*, 713 F.2d 1461, 1464 (9th Cir.1983). Thus, when "California appellate courts
14 have rejected the Ninth Circuit's interpretation of California law," a federal court
15 "must follow the more recent California cases." *Silicon Image, Inc. v. Analogix*
16 *Semiconductor*, 642 F. Supp. 2d 957, 969 (N.D. Cal. 2008). Accordingly, the
17 Constitution commands that *Shah* is binding on this Court.[4]

18      **B.    *Shah* Requires the Court to Deny the Motion to Exclude Regan and**
19           **that Plaintiffs' Damages Must Be Measured By the Market Value**
20           **Established by Infinite Reality's Recent Deal to Purchase DRL.**

21      In *Shah*, the plaintiff contracted to work for the defendant Skillz Inc., a
22 "Silicon Valley … startup" specializing in "mobile gaming" that "provides an online
23 platform where users can play video games and compete with others on their mobile
24 devices." 320 Cal.Rptr.3d at 179-180. The plaintiff took the job in part to earn

25

26 _____
[4] Plaintiffs do not agree with Defendants' interpretation of *First Nat'l* even if it were
27 still applicable. But even if *First Nat'l* stood for the propositions advanced by
Defendants (it does not), it is now irrelevant because its statements regarding
28 California contract law have been overruled by California's own courts.

"options to buy Skillz stock." *Id.* at 179. The court recognized that "the hope" of those who acquire stock in such "startups" is "that the company will undergo an initial public offering (IPO)" or be "sold to another company," allowing them "to sell their stock … at a significant profit." *Id.* at 179-180 and n.1.

In fact, "Skillz had an IPO in December 2020." *Id.* at 180. But the plaintiff "was not able to realize the Silicon Valley dream because he lost all of his stock options when Skillz terminated him" two years before the IPO. *Id.* He then "sued Skillz for breach of contract," alleging that it "wrongfully prevented him from exercising his stock options."[5] *Id.* The jury agreed and "found that Skillz breached its contracts" and wrongfully divested the plaintiff of his shares in the company. *Id.*

Despite this finding, Skillz argued that the plaintiff was entitled to only "negligible" damages because, in its view, the value of the divested shares must be calculated "as of the date of breach," which was "before the IPO," at a time when "there [wa]s no readily available market for the stock."[6] *Id.* at 192-93. Ironically, in making this argument, Skillz's brief prominently cited Judge Stevenson's order in the present case denying Plaintiffs' motion to compel discovery regarding the current value of DRL's stock in 2019 based on the conclusion that "breach-of-contract damages" must *always* "be measured as of the date of the alleged breach."[7] But *Shah* held that this was an incorrect reading of California law. *Shah* held that "[a]lthough damages in breach of contract actions, *as a general rule*, should be

---

[5] The plaintiff's complaint originally pleaded five counts, but four were ultimately dismissed or dropped and "[t]he case proceeded to trial on [plaintiff's] only remaining cause of action for breach of contract," i.e., the stock purchase agreement. *Shah*, 320 Cal.Rptr.3d at 184.

[6] Specifically, Skillz argued that "the value of Skillz stock on the date" of its breach was "$1.12 [per] share." Appellant's Opening Brief, *Shah v. Skillz Inc.* (Dec. 27, 2022) (No. A165372), 2022 WL 18276708, at *26.

[7] *Id.* at *56-57 (quoting *Laub v. Horbaczewski*, No. CV-17-16210, 2020 WL 7978227, at *8 (C.D. Cal. Nov. 17, 2020)).

measured from the date of the breach under California law, ***that rule does not apply*** to the breach of a contract for shares in a "***startup***" that has "***no readily available market for the stock at the time of the breach***." 320 Cal.Rptr.3d at 192 (emphasis added).

The court rejected Skillz's argument and Judge Stevenson's holding that "California law requires" that damages for breach of a contract to convey stock in a closely held corporation "be valued as of the date of the alleged breach." *Id.* at 187. Rather, *Shah* recognized that the prior California decisions addressing the measure of contract damages had "no occasion to consider whether damages should have been measured as of a date other than the date of breach based on equitable considerations." *Id.* at 191.

Addressing this question of first impression, *Shah* noted that "California courts have long recognized that '[t]he rules of law governing the recovery of damages for breach of contract are very flexible.'" *Id.* at 187 (citation omitted). "Under California contract law, the theory is that the party injured by a breach should receive nearly as possible the equivalent of the benefits of performance" by "put[ing] the injured party in as good a position as he would have been had performance been rendered as promised." *Id.* (citation omitted). This dictates that "'[t]he general rule that the measure of damages is the difference between the contract price and the market value [at the time of breach] is not a hard-and-fast rule, but may be varied *if circumstances require it*.'" *Id.* at 188 (citation omitted) (emphasis in original).

Applying these principles, the court held that when a defendant breaches a contract to convey shares in a "startup" *before* "there is [a] readily available market for the stock," the proper measure of the plaintiff's damages is "the highest intermediate price of the defendant's stock" between the "date of breach" and the first date when a "readily available market" exists. *Id.* at 192-193, 196. This is when, absent the defendant's breach, the plaintiff would have been "free to sell *for*

*the first time and without any limitations* any and all [] stock that he would have acquired." *Id.* at 193 (emphasis in original). This normally occurs when the startup "undergo[es] an initial public offering (IPO)" or "is sold to another company." *Id.* at 180 and n.1. As the court explained:

> Indeed, measuring damages from the date of breach, rather than a date in the future, in cases where there is no market for the stock at the time of the breach does not achieve the requisite end of putting the nonbreaching party in the position most closely reflecting the one he would have held absent [the] breach.

*Id.* at 190 (citation omitted). "A contrary ruling … would allow a private startup company" to divest shareholders of their stock "with relative impunity" at any time "before the company has been sold or goes public because the financial consequences of doing so would be negligible." *Id.* at 193.

Moreover, a startup cannot avert this rule by asserting that it is speculative when, absent the breach, the plaintiff "would have exercised all of his options." *Id.* at 194. This is because, it is "[t]he defendant's acts," not the plaintiff's, that "prevent[ed] [the] court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable." *Id.* at 195 (citations omitted). Thus, "fundamental justice requires that, as between [the plaintiff] and [the defendant], the perils of such uncertainty should be laid at [the] defendant's door." *Id.* (citations omitted). So too here.

Here, the first time a readily available market for DRL stock will exist is about to occur when Defendants sell DRL "to another company." *See id.* at 180 n.1. This represents the first date that, absent Defendants' breach, Plaintiffs would have been "free to sell *for the first time and without any limitations* any and all [DRL] stock that [they] would have acquired." *See id.* at 193 (emphasis in original). Thus, here, the measure of Plaintiffs' damages is the value of DRL shares at the time of Infinite Reality's purchase of DRL.

**C.** ***Shah* also Shows that the Same Measure of Damages Should Apply to Plaintiff's Tort Claims**

As Plaintiffs' prior briefing explained, California's Courts of Appeal are split regarding whether California law permits a stock-misappropriation victim bringing tort claims to recover for an increased value of the shares after the date of misappropriation. *Compare Friedman v. Renz*, 31 Cal. App. 2d 71, 73 (1939) (tort law permits recovery of misappropriated stock's highest intermediate value between date of conversion and trial) *with Betzer v. Olney*, 14 Cal. App. 2d 53, 61 (1936) (same); *with Wong v. Paine, Webber, Jackson & Curtis*, 208 Cal. App. 2d 17 (1962) (tort law limits victim's damages to stock's value at time of theft).

*Shah*'s holding that adopting Defendants' argument would violate California's public policy by enabling "a private startup company" to divest shareholders of their stock "with relative impunity" at any time "before the company has been sold or goes public because the financial consequences of doing so would be negligible" provides further evidence that *Friedman* and *Betzer* should govern damages for Plaintiffs' tort claims. *See Shah*, 320 Cal.Rptr.3d at 193. These cases likewise recognize that public policy demonstrates that a tort victim who is deprived of shares in a closely held corporation is entitled to an award of damages measured at the "highest market value of stock between the date of conversion and the trial." *Friedman*, 31 Cal. App. 2d at 72. This is because a "manifest injustice" would occur if a victim who did not want to sell his or her shares at the time of the misappropriation was limited to damages based on the stock's "value as [of that] date." *Betzer*, 14 Cal. App. 2d at 61. As these decisions demonstrate, the public policy endorsed by *Shah* would be equally offended if tortfeasors were able to divest a startup's shareholders of their stock "with relative impunity … before the company has been sold or goes public because the financial consequences of doing so would be negligible." *See Shah*, 320 Cal.Rptr.3d at 193.

1  **II.    CONCLUSION**

2          For the foregoing reasons, Plaintiffs respectfully ask the Court to take notice

3  of *Shah v. Skillz Inc.*, 101 Cal. App. 5th 285, 320 Cal.Rptr.3d 175 (2024), which is

4  attached hereto as **Exhibit 1**.

5

6   DATED: May 7, 2024                              Respectfully submitted,

7                                                   BARTKO LLP

8                                          By: _____

9

10                                                  PATRICK M. RYAN
                                                    STEPHEN S. STEINBERG
11                                                  CHAD E. DEVEAUX
                                          Attorneys for Plaintiffs JUSTICE LAUB
12                                                  and DAN KANES

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Shah v. Skillz Inc., 101 Cal.App.5th 285 (2024)

320 Cal.Rptr.3d 175, 2024 Daily Journal D.A.R. 3094

101 Cal.App.5th 285

Court of Appeal, First District, Division 5, California.

Gautam SHAH, Plaintiff and Appellant,

v.

SKILLZ INC., Defendant and Appellant.

A165372
|
Filed April 8, 2024
|

Certified for Partial Publication.[*]

[*]   Pursuant to California Rules of Court, rules
8.1105(b) and 8.1110, this opinion is certified for
publication with the exception of parts A and B of
the Discussion.

**Synopsis**

**Background:** Former employee brought action against
employer, a startup, for breach of contract, retaliation, and
wrongful termination, alleging employer lacked cause to
terminate him prior to its initial public offering (IPO) and
thereby wrongfully prevented him from exercising stock
options. Following trial and grant of employer's motion for
directed verdict as to claims for retaliation and wrongful
termination, the Superior Court, San Francisco County,
No. CGC-19-576014, Suzanne Ramos Bolanos, J., entered
judgment on jury's verdict awarding employee $11,557,173
for breach of contract, then denied employer's motion for
judgment notwithstanding the verdict (JNOV), denied its
motion for new trial on condition that employee accept
remittitur in the amount of $4,358,358, and after employee did
so, entered amended judgment for employee in such amount.
Employee appealed and employer cross-appealed.

**Holdings:** The Court of Appeal, Danny Y. Chou, J., held that:

[1] trial court was not required to value stock on or near date
of breach when calculating damages for breach of contract;

[2] trial court reasonably valued stock from date when lock-
up period ended after employer's initial public offering (IPO);

[3] sufficient evidence supported finding that employee
would not have sold stock on secondary markets prior to IPO;

[4] sufficient evidence supported finding that employee
would have exercised all vested options within 90 days of
termination absent breach;

[5] trial court was authorized to adopt different measure of
damages than jury had adopted when calculating remittitur
amount;

[6] employee's complaint gave employer sufficient notice that
employee sought damages for breach of performance grant;
but

[7] stock options did not constitute "wages" under Labor
Code.

Affirmed in part, reversed in part, and remanded with
directions.

**Procedural Posture(s):** On Appeal; Motion for New Trial;
Motion for Judgment Notwithstanding the Verdict (JNOV);
Motion for Judgment as a Matter of Law (JMOL)/Directed
Verdict.

West Headnotes (26)

[1]   **Corporations and Business
      Organizations** 🔑 Options to buy or sell
      Under both California and Delaware law,
      damages for lost stock options in a breach-of-
      contract action may be measured from a date
      other than the date of breach based on equitable
      considerations, including whether a reasonably
      available market for the stock exists at the time
      of breach.

[2]   **Damages** 🔑 Failure to Perform in General
      The rules of law governing the recovery of
      damages for breach of contract are very flexible;
      the theory is that the party injured by a breach
      should receive nearly as possible the equivalent
      to the benefits of performance, and the aim is to
      put the injured party in as good a position as he
      would have been had performance been rendered
      as promised.

*Shan v. Skillz Inc.*, 101 Cal.App.5th 285 (2024)
320 Cal.Rptr.3d 175, 2024 Daily Journal D.A.R. 3094

**[3]    Damages    👉  Under circumstances within contemplation of parties**

In a breach-of-contract action, California law generally permits recovery of damages which might have been reasonably contemplated or foreseen by both parties at the time they made the contract, as the probable result of the breach.

**[4]    Damages    👉  Mode of estimating damages in general**

Damages in breach-of-contract actions involving personal property, unlike real property, need not be determined as of the date of breach.

**[5]    Damages    👉  Mode of estimating damages in general**

The general rule that the measure of damages in a breach-of-contract case involving personal property is the difference between the contract price and the market value at the time of breach is not a hard-and-fast rule, but may be varied if circumstances require it.

**[6]    Damages    👉  Mode of estimating damages in general**

The general rule that the measure of damages in a breach-of-contract case involving personal property is the difference between the contract price and the market value at the time of breach does not apply where a better method of measuring loss or damages is available under the circumstances, such as when there is no market available at the time and place of performance.

**[7]    Corporations and Business Organizations    👉  Options to buy or sell**

The contract theory of damages presumes that a plaintiff seeking damages for lost stock options in a breach-of-contract case has the ability to "cover," or mitigate damages by protecting prospective profit, by entering the market to purchase the lost shares, and based on this presumption, the contract theory puts the onus on the plaintiff to cover immediately upon the breach; thus, when the plaintiff is in theory able to purchase his lost shares at the time of the breach, contract damages are fixed as of the breach date.

**[8]    Corporations and Business Organizations    👉  Options to buy or sell**

Where a plaintiff seeking damages for lost stock options in a breach-of-contract case cannot cover his damages by purchasing the lost shares immediately upon the breach due to the lack of an available market for the stock at the time of breach, the reasoning underlying the contract theory of damages no longer applies, and the blurring between conversion and breach-of-contract remedies may be justified; the conversion theory of damages extends the cover date to a reasonable time in the future when the plaintiff could have mitigated the damages caused by the breach, which in turn allows the plaintiff to recover, to a limited extent, a relevant benefit of his bargain, namely the prospect of future profits.

**[9]    Labor and Employment    👉  Measure and amount**

In former employee's action against employer for breach of contract, which arose from employer's termination of employee for pretextual "cause" so as to preclude employee from exercising stock options, damages that employee could recover based on lost stock options were not limited to difference between exercise price of vested stock options and value of employer's stock on or near date of breach, which was date of termination; no market was available for stock at time of breach, such that employee could not have covered his damages by purchasing lost shares immediately upon breach, and measuring damages from date of breach would not compensate employee for damages that were reasonably contemplated and foreseen by parties at time they contracted for stock option grants.

Shah v. Skillz Inc., 101 Cal.App.5th 285 (2024)

320 Cal.Rptr.3d 175, 2024 Daily Journal D.A.R. 3094

**[10]    Corporations and Business
Organizations** 🔑 Options to buy or sell

Although damages in breach-of-contract actions,
as a general rule, should be measured from
the date of breach under California law, that
rule does not apply to damages based on lost
stock options where there is no readily available
market for the stock at the time of the breach.

**[11]    Labor and Employment** 🔑 Measure and
amount

Trial court reasonably calculated its award of
damages to former employee on his breach-
of-contract claim against employer, which
arose from employer's termination of employee
for pretextual "cause" such that employee's
vested stock options immediately expired under
terms of employment contract and before
employer's initial public offering (IPO), by
valuing employer's stock from date when lock-
up period ended after IPO; end of lock-up
period was first date on which employee would
have been free to sell, without limitations, any
and all stock he would have acquired had he
been allowed to exercise his stock options upon
his termination on date lock-up period ended,
thereby approximating benefits of bargain had
employer not breached contracts governing stock
option grant.

**[12]    Appeal and Error** 🔑 Amount of recovery or
extent of relief

Employer forfeited its argument, on appeal from
trial court's entry of judgment awarding former
employee damages for breach of contract based
on stock options that expired when employer
pretextually terminated him for "cause," that
trial court should not have calculated damages
based on value of shares at end of lock-
up period following employer's initial public
offering (IPO) because employee could have sold
stock in secondary markets before IPO, where
employer failed to raise such argument at trial.

**[13]    Labor and Employment** 🔑 Measure and
amount

Sufficient evidence supported trial court's
finding, when calculating damages on former
employee's claim against employer for breach
of contract based on lost stock options resulting
from employer's pretextual termination of
employee for "cause," that employee would not
have sold stock on secondary markets prior to
employer's initial public offering (IPO), making
it improper to value stock pre-IPO; lack of
readily available market for employer's stock
prior to IPO strongly supported employee's
testimony that he would not have sold his stock in
secondary market, employee testified he would
have followed lead of officers who did not sell
prior to IPO, and employee's acceptance of stock
options instead of monetary compensation for his
work indicated he believed in employer's IPO
prospects.

**[14]    Labor and Employment** 🔑 Measure and
amount

Sufficient evidence supported trial court's
finding, when calculating damages based on lost
stock options on remittitur of former employee's
breach-of-contract claim against employer, that
if employer had not pretextually terminated
employee for "cause" so as to cause his
vested stock options to immediately expire,
employee would have exercised all of his vested
stock options within 90 days of termination
as contractually permitted for not-for-cause
terminations; employee told employer's chief
revenue officer (CRO) that he wanted to exercise
his options on day he was terminated but CRO
told employee options were forfeited due to
termination for cause, and employee tried to
exercise portion of his options one month later,
at which time employer told him in writing that
options were void.

**[15]    Labor and Employment** 🔑 Measure and
amount

Employer, through its breach of employment
contract and other contracts governing grants

**Shah v. Skillz Inc., 101 Cal.App.5th 285 (2024)**
320 Cal.Rptr.3d 175, 2024 Daily Journal D.A.R. 3094

of stock options to employee, rendered futile any attempt by employee to exercise his stock options after employer terminated him for pretextual "cause," and thus, in valuing employer's stock as basis for lost-stock-option damages on employee's breach-of-contract claim against employer, trial court properly assumed employee would have exercised all of his options had he been able, where contracts provided that vested stock options could be exercised within 90 days of not-for-cause termination but that they would immediately expire upon for-cause termination.

**[16]    Corporations and Business Organizations**  ⚷  Options to buy or sell

Under Delaware law, in a breach-of-contract case, the stock price used to calculate damages for lost stock options need not be the price on the date of breach, even when damages are measured from that date.

**[17]    Damages**  ⚷  Under circumstances within contemplation of parties
**Damages**  ⚷  Failure to Perform in General

Delaware law applies the principle of expectation damages in breach-of-contract actions and measures those damages by the amount of money that would put the promisee in the same position as if the promisor had performed the contract.

**[18]    Damages**  ⚷  Mode of estimating damages in general

Delaware law focuses on the reasonable expectations of the parties ex ante in determining damages for breach of contract.

**[19]    Corporations and Business Organizations**  ⚷  Options to buy or sell

Delaware courts consider the equities in determining the proper measure of damages in breach-of-contract actions involving lost stock

options, including events occurring up to the time of judgment.

**[20]    Labor and Employment**  ⚷  Questions of law or fact

Measure of damages on former employee's breach-of-contract claim against employer under California or Delaware law, which required valuation of lost stock options, was question of law to be decided by trial court, and thus, when denying employer's motion for new trial on condition that employee accept remittitur, trial court was authorized to substitute different measure of damages than jury had adopted when calculating remittitur of damages award, where measure of damages that trial court adopted was permissible under both California and Delaware law.

**[21]    Pleading**  ⚷  Defects and objections which may be cured or waived

No error or defect in a pleading is to be regarded unless it affects substantial rights.

**[22]    Pleading**  ⚷  Defects and objections which may be cured or waived

The primary function of a pleading is to give the other party notice so that it may prepare its case, and a defect in a pleading that otherwise properly notifies a party cannot be said to affect substantial rights.

**[23]    Labor and Employment**  ⚷  Pleading
**New Trial**  ⚷  Remission or Reduction of Excess of Recovery

Former employee's breach-of-contract complaint gave employer sufficient notice that employee sought damages for breach of performance grant in addition to employment contract and notice of stock option grant, and thus, any deficiencies in complaint did not permit trial court to exclude damages for breach of performance grant from its remittitur of damages that jury

awarded for lost stock options granted under all three contracts; complaint alleged employee's compensation under employment contract was "adjusted" through award of additional stock options under performance grant and that by depriving him of additional options, employer breached both employment grant and notice as altered by performance grant, employee sought restoration of options under performance grant, and employer did not argue defense was impaired.

**[24]    Appeal and Error** 🔖 De novo review

The Court of Appeal reviews a directed verdict de novo.

**[25]    Labor and Employment** 🔖 Particular cases in general

Stock options that employer, a startup, granted employee pursuant to employment contract and other agreements did not constitute "wages" under Labor Code, and thus, employee's allegations that employer pretextually fired him for "cause" in retaliation for asserting his right to his vested stock options and so as to cause such options to immediately expire did not support claims against employer for retaliation and wrongful termination; stock options did not constitute "amounts" that were "fixed or ascertained," but rather, constituted contractual rights to buy shares, and purposes of Labor Code's prohibition on employers receiving any part of wages from employees, namely to protect employees' reliance interests and avoid bypassing of minimum wage laws, did not apply to stock options. 🚩Cal. Civ. Proc. Code § 221; 🔖Cal. Lab. Code § 200(a).

**[26]    Labor and Employment** 🔖 What are wages

"Stock options" are not "wages" within the meaning of the Labor Code because they are not "amounts" for labor performed by employees, and indeed are not money at all; they are

contractual rights to buy shares of stock. 🔖Cal. Lab. Code § 200(a).

**\*179**  Trial Court: City & County of San Francisco Superior Court Trial Judge: Hon. Suzanne Ramos Bolanos (City & County of San Francisco Super. Ct. No. CGC-19-576014)

**Attorneys and Law Firms**

Eric Andrew Hiduke; William R. Herochik, Santa Clara; Law Offices of Michael G. Ackerman and Michael G. Ackerman, Santa Clara; Law Office of Ted W. Pelletier and Ted W. Pelletier, Oakland, for Plaintiff.

Orrick, Herrington & Sutcliffe, Amari L. Hammonds, Sheila Baynes, Lynne Charlotte Hermle, Menlo Park, Joseph Charles Liburt, Jillian Victoria Kaltner, Menlo Park, Andrew David Silverman, and Jodie Liu for Defendant.

**Opinion**

CHOU, J.

Plaintiff Gautam Shah joined defendant Skillz, Inc. (Skillz), a private company, as an employee in 2015. Like many people in Silicon Valley who join startups, Shah accepted less cash compensation in exchange for options to buy Skillz stock at a predetermined exercise price. "The unique value of" these stock options to employees like Shah "is that when the market price of the optioned stock surpasses the ... 'exercise' price, he can buy at the lower figure for a virtually certain profitable investment **\*180** ...." (🔖Bertero v. Natl. General Corp. (1967) 254 Cal.App.2d 126, 141, 62 Cal.Rptr. 714 (🔖Bertero).) For startup employees like Shah, the hope is that the company will undergo an initial public offering (IPO) —which would allow those employees to sell their stock on the open market at a significant profit. [1] Indeed, the primary value of stock options like the ones granted to Shah lies with the ability to cash out those options if the company is successful and goes public.

[1]    These employees may also profit from their stock options if the startup is sold to another company. (See Alon-Beck, *Unicorn Stock Options—Golden Goose or Trojan Horse?* (2019) 2019 Colum. Bus. L.Rev. 107, 129 (*Unicorn Stock Options*) ["In the

event of a sale of the company, employees can exercise the vested options prior to the sale. After doing so, they will either be able to sell their shares or their options will be canceled in exchange for a payment equal to the spread between the exercise price and the sale price"].)

Skillz had an IPO in December 2020. But Shah was not able to realize the Silicon Valley dream because he lost all of his stock options when Skillz terminated him for cause in 2018. As a result, Shah could not exercise his options and sell the Skillz stock he would have acquired upon doing so at a huge profit after the IPO like other former and current Skillz employees.

Shah sued Skillz for breach of contract, alleging that Skillz did not have cause to terminate him and wrongfully prevented him from exercising the stock options he had earned as a Skillz employee. A jury found that Skillz breached its contracts with Shah and awarded Shah over $11.5 million in damages for the lost options. The trial court, however, conditioned the denial of Skillz's new trial motion on Shah's acceptance of a remittitur in the amount of $4,358,358. After Shah accepted the remittitur, the court entered judgment for Shah in that amount.

Both parties appealed. Skillz contends that the judgment must be reversed due to defects in the jury instructions and special verdict forms. Skillz further contends that the damages awarded to Shah are "contrary to law" because they were not measured as of the date of breach, requiring either a far lower award or a new trial on damages. Meanwhile, Shah contends that the jury verdict in excess of $11.5 million should be reinstated because of errors in the trial court's new trial orders and remittitur. Shah also contends that the court erred in dismissing his tort claims before trial because his stock options are "wages" under the Labor Code. We conclude that the court abused its discretion by excluding approximately $2.3 million in damages attributable to the loss of some of Shah's stock options from the amount of the remittitur but affirm in all other respects.

In the portions of our opinion certified for publication, we hold that: (1) under both California and Delaware law, Shah's damages were properly measured after the date of breach, following the IPO; (2) the operative pleading gave Skillz adequate notice that Shah sought damages for the loss of the performance stock options he was granted in late 2016; and (3) stock options are not wages under the Labor Code. In the unpublished portion of our opinion, we reject the parties' other arguments.

## I. BACKGROUND

### A. Facts

Skillz is a mobile gaming company founded in 2012 by Andrew Paradise and Casey Chafkin. The company provides an online platform where users can play video games and compete with others on their mobile devices. Paradise is Skillz's Chief Executive Officer and Chafkin is its Chief Revenue Officer.

**\*181** In October 2015, Skillz hired Shah as Director of Skillz Live, a new program Skillz was launching at the time. Shah's title later changed to Director of Finance and Strategy in mid-2017. At the time Shah joined Skillz, two contracts governed his employment: (1) the September 30, 2015 offer letter (Employment Contract) that Shah accepted and signed; and (2) the Notice of Stock Option Grant (Notice).

Shah's Employment Contract established that his employment was at-will and "may be terminated by [him] or the Company at any time for any reason with or without advance notice." (Bolding and italics omitted.) It also referenced and incorporated a mandatory confidentiality agreement that Shah separately signed and returned. As relevant here, the confidentiality agreement prohibited Shah, "without the prior written consent of the Company, [from] us[ing], except in the course of performance of [his] duties for the Company or by court order, disclos[ing] or giv[ing] to others any Confidential Information." The Contract stated that Shah's annual salary was $160,000 and that he would be granted 69,487 stock options on a four-year vesting schedule (25 percent after one year, and 6.25 percent every three months thereafter). Any unvested options were to be forfeited if Shah left Skillz before all of his options vested.

The Employment Contract further specified that the grant of Shah's stock options was "subject to and exclusively governed by" the Notice, the 2012 Equity Incentive Plan (Plan),[2] and the Option Award Agreement.[3] The Plan provided that if Shah was terminated without cause, he would have three months from his termination date to exercise his vested options. If Shah was terminated for cause, however, his options would expire on the date of his termination. The Plan defined "cause" to include various offenses, including the employee's "breach of his or her fiduciary trust or duty," "material breach" of the confidentiality agreement, "gross misconduct or any act which is injurious" to Skillz. Theft was

also considered a "cause" offense, even though it was not specifically enumerated in the Plan. A finding of "cause" was to be made by Skillz's Board of Directors (Board).

[2] In November 2015, Skillz replaced the 2012 Plan with an updated Equity Incentive Plan, which the parties agree was the operative Plan governing Shah's stock options. Hereinafter, Plan means the 2015 Plan.

[3] The Plan and the Option Award Agreement do not differ materially with respect to Shah's stock option rights upon the termination of his employment.

The Notice, the second contract governing Shah's employment, is a one-page document that summarizes the terms of Shah's initial stock option grant. It established an exercise price of 34 cents per share. It also mistakenly included a two-year vesting schedule instead of the four-year vesting schedule contained in Shah's Employment Contract. Skillz later informed Shah of this error and sent him a correction letter to sign. But Shah did not sign the letter despite repeated requests from Skillz. [4] Finally, the Notice "incorporated" the Plan and Option Award Agreement "by reference."

[4] The jury found that Shah's initial stock option grant was subject to a four-year vesting schedule. Shah does not challenge this finding on appeal.

In late 2016, Skillz was in financial trouble and asked higher earning employees like Shah to voluntarily reduce their cash compensation. Specifically, Skillz asked Shah to take a $62,000 reduction in compensation, consisting of a $20,000 reduction in Shah's annual salary and the elimination **\*182** of his $42,000 bonus. In exchange, Skillz granted 21,000 additional stock options to Shah. This additional grant was memorialized in a December 5, 2016 Compensation and Title Adjustment Letter (Performance Grant)—the third contract at issue in this case. These options were granted to Shah quarterly and vested immediately upon each grant. 14,250 of these options had an exercise price of 38 cents per share while the remaining 6,750 options had an exercise price of $1.12 per share. In September 2017, Skillz reinstated the $62,000 in Shah's cash compensation and ended the Performance Grant.

In January 2018, Shah was scheduled to go on a trip with Paradise to meet with potential investors to obtain additional funding for the company. Right before this trip, Shah sent Paradise an email shortly after midnight on January 18, 2018,

asking to discuss "[his] future at the company and formaliz[e] [his] associated compensation." He acknowledged that it was a busy time but that this was important to him. Paradise promptly responded that human resources "will follow up" but that given the timing of Shah's email, it would be best to cancel his involvement in the investor trip. Paradise then "asked company counsel and [Chafkin] to deal with this" so he could focus on the trip.

Later that same day, Shah met with Chafkin and told him he wanted a promotion and more compensation. Chafkin responded that a promotion was not appropriate given Shah's current performance. Shah also brought up his vesting schedule and the correction letter he had not yet signed. Chafkin believed Shah "was looking for something in exchange for signing ... the correction letter." The next day, Shah spoke with Paradise and Chafkin over the phone about his future at the company and the correction letter Skillz was "forcing" him to sign. Shah commented that it did not make sense for him to remain at the company if Skillz did not plan to promote him or increase his compensation. At the end of this call, Chafkin and Paradise asked Shah for an outline of what he was looking for.

On January 21, 2018, Shah emailed a proposal to Chafkin and Paradise about transitioning to consultant work for Skillz. The proposal outlined two alternatives for compensation. The first proposed a $192,000 annual cash salary and an equity bonus of "0.50% of FDSO [fully diluted shares outstanding] upon completion of Qualified Financing." The second included no cash salary but proposed that Shah receive 176,050 Skillz shares as an equity salary with the same equity bonus. Chafkin found this proposal "comical" because the compensation requested by Shah was worth "a couple [ ] million dollars." Skillz did not respond to Shah's proposal.

On January 22, 2018, Shah forwarded an email from his work account to his personal email account. That email contained a confidential business report prepared by Mike Termezy (Termezy report). Termezy was a consultant hired by Skillz to analyze its "most confidential business data to determine where [it] had opportunities to grow [its] business in ... a very competitive market space."

On January 24, 2018, Chafkin asked Skillz's then Vice President of Engineering to conduct "a forensic analysis of the company property that Mr. Shah had access to", including Shah's emails. Chafkin testified that given Shah's representation about leaving the company and compensation

request, he wanted to find out whether Shah had done anything harmful to the company's interests.

The search—which was completed on the same day that Chafkin made the request—revealed that Shah had forwarded the Termezy report to his personal email. **\*183** Chafkin testified that there was no legitimate business reason for Shah to have done this because he could have just logged into his work email to view the report. A committee formed within Skillz to investigate this matter, which included Chafkin and company counsel, recommended terminating Shah for cause that same day. The committee, however, never spoke with Shah before making its recommendation. Paradise discussed the committee's recommendation with a Board member, who then discussed it with other Board members. Paradise stated that as far as he knew, the Board "agreed with the recommendation from the team, that cause was appropriate."

Later that same afternoon, Chafkin met with Shah and told him that he was being terminated for cause for violating company policy on confidential information and theft. Shah stated that he wanted to exercise his stock options,[5] but Chafkin responded that "the penalty for being terminated with cause is the company takes back all the options." At the end of the meeting, Chafkin walked Shah out the door. A month or so later, Shah tried to exercise a small portion of his options because he had not received anything in writing from Skillz prohibiting him from doing so. Shah sent Skillz a check for exercising 100 options but was notified by Skillz that his options were void under his stock option agreement.

[5]  As of January 24, 2018, the date of his termination, 39,086 of Shah's 69,487 initial options and all 21,000 of his Performance Grant options had vested.

In December 2020, Skillz had its IPO, with an opening stock price of $17.89 per share.[6] Current and former Skillz employees like Shah, however, were subject to a six-month "lock-up" period. As a result, they could sell their Skillz shares on the public exchange no earlier than June 14, 2021. But there was one exception to this limitation. As part of an early release, Skillz employees could sell up to 18.9 percent of their shares on March 23, 2021. On that date, Skillz stock sold for $23.34 per share. Eighty-four shareholders (which included employees, former employees, and investors) sold a total of 36.8 million shares that day.[7] Between June 14 and 30, 2021, Skillz stock sold for an average price of $20.01 per share.

[6]  We grant Skillz's unopposed request for judicial notice.

[7]  It is not clear from the record what percentage of eligible shares were sold by Skillz employees on the early release date.

Before the IPO, there may have been private secondary markets where certain Skillz shareholders could sell their Skillz stock. Skillz facilitated some of these private sales, the first of which occurred at the end of 2018 with a purchase price of 96 cents per share.

###  B. Procedural History

In May 2019, Shah sued Skillz for breach of contract, breach of the implied covenant of good faith and fair dealing, wrongful termination, retaliation, and conversion.[8] Skillz later filed a First Amended Complaint (FAC), which omitted the breach of implied covenant claim but otherwise mirrored his original complaint. The FAC alleged that "the thin pretextual 'reasoning' for [Shah's] termination demonstrate[d] that [his] termination was taken in retaliation for [ ] asserting his rights to his vested benefits." The breach of contract cause of action alleged that Skillz breached the Employment Contract and Notice, and the FAC attached both documents as exhibits. The FAC also referenced **\*184** the Performance Grant and expressly sought Shah's "fully vested option[s] ... granted pursuant to the Performance Grant" as a remedy. The FAC did not, however, attach the Performance Grant itself as an exhibit. The FAC also sought tort damages, including punitive damages and attorney fees, in connection with Shah's causes of action for wrongful termination and retaliation.

[8]  Shah dismissed his conversion claim before trial.

Before trial, the trial court made several pertinent rulings on the parties' motions in limine. First, the court ruled that Shah's stock options were not "wages" under the Labor Code. This ruling negated Shah's retaliation and wrongful termination claims—which the court dismissed following Skillz's motion for directed verdict. The court also granted Skillz's motion to preclude evidence and argument regarding any unpled causes of action, including Shah's dismissed claim for breach of the implied covenant.

Finally, with respect to his breach of contract claim, Shah asked the trial court to find that damages for his lost stock

options should not be measured at the time of breach (the date of Shah's termination) but at the time Shah could have first sold his shares after the IPO in March and June 2021. Skillz opposed, arguing that the measure of damages should be "the difference between the fair market value of Skillz'[s] shares at the time of breach and the agreed upon exercise price per share." According to Skillz, the fair market value at the time of breach was equal to the "409A" valuation.[9] The court tentatively agreed with Skillz that damages should be measured at the date of breach. The next day, however, the court changed its mind and ruled that Shah's motion was premature. The court reasoned that there were "factual issues that need to be decided by the jury" as to whether Shah was terminated for cause before it could determine the proper measure of damages.

[9]    "A 409A valuation is an appraisal of a company's shares of stock that is conducted to determine for tax purposes the value of stock options." (*Blattman v. Siebel* (D.Del. Jan. 29, 2020, Civ. No. 15-530-CFC) 2020 WL 475413.) It tends to be lower than other valuations in order to minimize taxable income. (See 🚩*Deane v. Maginn* (Del.Ch.Ct. Nov. 1, 2022) 2022 WL 16557974, *22, fn. 263, 2022 Del.Ch. Lexis 315, *46, fn. 263 ["the 2020 409A Valuation, performed for 🚩Internal Revenue Service Code 409A purposes, provided the lowest valuation"].)

The case proceeded to trial on Shah's only remaining cause of action for breach of contract. Shah argued that Skillz breached various contracts by preventing him from exercising his vested stock options under the pretext that cause existed for his termination. Shah testified that he sent the Termezy report to his personal email so he could read it on his iPad at home after he was criticized by Chafkin for not reading it at a prior meeting. Shah also testified that he had done this before with other emails "from time to time." According to Shah, there was no evidence he intended to commit theft or use the report for any improper purpose.

The parties' experts presented differing testimony on the damages suffered by Shah due to the lost stock options. Shah's expert opined that Shah suffered approximately $11.5 million in damages assuming a four-year vesting schedule. In reaching this opinion, he assumed that Shah would have exercised all of his vested options shortly after he was terminated in January 2018 and held onto them until the IPO

in late 2020. He further assumed that Shah would have sold 18.9 percent of his shares at the early release in March 2021 and his remaining shares over a two-week period between June 14 and 30, 2021, immediately after the lock-up period ended.

**\*185** Skillz's expert testified that Shah suffered only $41,032 in damages due to the loss of his stock options (39,086 shares from his initial grant and 21,000 shares from the Performance Grant) as of the date of his termination. According to Skillz's expert, the options were only worth $1.12 per share at that time based on the most recent 409A valuation before Shah's termination.

Skillz's expert also offered an alternative calculation of Shah's damages if they were not determined as of the date of Shah's termination. According to Skillz's expert, Shah's expert made "inappropriate assumptions." Instead of assuming that Shah would have sold 18.9 percent of his shares in March 2021 and the rest immediately after the lock-up period ended in June 2021, Skillz's expert used the average price of Skillz stock between June 14, 2021 (the date the lock-up period ended) and September 8, 2021 (the day before his testimony) to calculate Shah's damages. Based on this price, Skillz's expert determined that Shah suffered about $6.7 million in damages, consisting of approximately $4.4 million from the initial grant and $2.3 million from the Performance Grant.

At the close of evidence, the parties asked the trial court to instruct the jury as to what date it should use to measure the value of Shah's lost stock options. The court, however, declined to do so and instructed the jury to determine the valuation date. It did, however, caution the jury that damages that are "speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." As to each of the three contracts (Employment Contract, Notice, and Performance Grant), the jury found that Skillz breached the contract "by not allowing Shah to exercise his vested stock options under the pretext that 'cause' existed for his termination[.]" (Bolding omitted.) The jury awarded Shah $7,528,637 for the loss of his stock options under the initial grant and $4,028,536 for the loss of his options under the Performance Grant, for a total of $11,557,173. The court entered judgment on the jury's verdict.

Skillz moved for a JNOV and new trial. In its JNOV motion, Skillz argued that: (1) Shah cannot recover damages for breach of the Performance Grant because its breach was not pled in the FAC; (2) there was no evidence that Skillz

breached any contract by firing Shah for cause; and (3) the jury's award of $11.5 million was improper because damages for lost stock options must be measured as of the date of breach (Shah's termination). The new trial motion argued that: (1) various irregularities rendered the trial unfair to Skillz; (2) the jury awarded excessive damages; and (3) there was insufficient evidence to support the verdict.

The trial court denied the JNOV motion because "Shah presented evidence to support all of his claims" at trial. As for damages, the court conceded that "the jury needed further guidance on the appropriate measure of damages" and that the "date to value the loss of stock options remains an unsettled area of law in California" and is a complex topic that "might have been confusing to the jury." (Bolding and capitalization omitted.) To rectify this, the court conditioned its denial of Skillz's new trial motion on Shah's consent to a remittitur in the amount of $4,358,358. This amount came from the alternative calculation provided by Skillz's expert, excluding any damages for the lost stock options under the Performance Grant. Shah accepted the remittitur, and the court entered an amended judgment in his favor for the reduced remittitur amount.

Skillz timely appealed the judgment, the trial court's orders on the post-trial motions, and the amended judgment. Shah **186** timely cross-appealed these same judgments and orders.[10]

[10]    Following the parties' initial briefing, we requested and received supplemental briefing on the following issues: "1. Does the jury's finding that plaintiff Gautam Shah did not engage in unclean hands (unethical or dishonest conduct in relation to the three contracts) necessarily mean that it also found that Shah was not terminated for cause? [¶] 2. Does Delaware law govern "the 'measure of recovery' " for Shah's breach of contract claim under section 13.4 of the Equity Incentive Plan [citation]? Assuming Delaware law applies, may benefit-of-the-bargain damages be calculated from a date other than the date of breach and, if so, when? [¶] 3. Did the First Amended Complaint provide sufficient notice to defendant Skillz, Inc. (Skillz) to justify a jury instruction and verdict form question as to the third contract (the Performance Grant)? [Citations] The relevance of the language in the third contract that it "alter[ed]" the terms of Shah's Employment Contract should be discussed

in answering this question. [¶] 4. If this court reverses the judgment on damages, may it order a judgment in the amount of $30,487 (or $41,032) as argued by Skillz, rather than remand for a new trial on damages, in light of evidence at trial that Shah gave up 'about $70,000' in cash compensation in exchange for the Performance Grant stock options alone?"

## II. <u>DISCUSSION</u>

A.–B.[**]

[**]    See footnote *, *ante*.

Unpublished Text Follows

Skillz contends it is entitled to a JNOV or a new trial on liability based on errors in the jury instructions and special verdict forms. First, Skillz claims that the instructions and forms failed to identify any contractual obligation that was breached. Second, Skillz claims that the instructions and forms impermissibly referenced the term "pretext"—which is irrelevant in a breach of contract claim. We find no reversible error.

### 1. *Relevant Facts*

Before the trial began, Shah submitted proposed jury instructions, among other things, that the parties "entered into two contracts": the Employment Contract and Notice. Shah also included CACI No. 303 (breach of contract—essential factual elements)—which established as an element of the breach of contract cause of action that Skillz "failed to do something that the contract required it to do"—and an instruction and special verdict form addressing his abandoned breach of the implied covenant claim, which Shah later withdrew.[11] Around the same time, the trial court granted Skillz's motion in limine to preclude evidence and argument regarding any unpled causes of action, including Shah's claim for breach of the implied covenant.

[11]    Question 4 of Shah's proposed breach of the implied covenant verdict form asked: " 'Did Skillz, Inc. terminate Gautam Shah based upon pretext that he committed theft?' "

Skillz's proposed jury instructions, submitted during trial, included a modified version of CACI No. 303. The modified instruction required the jury to find that the contracts

Shah v. Skillz Inc., 101 Cal.App.5th 285 (2024)
320 Cal.Rptr.3d 175, 2024 Daily Journal D.A.R. 3094

"prohibited Skillz from terminating Shah's employment for cause" and that "Skillz terminated Shah's employment for cause." Skillz also submitted a proposed special verdict form with similar language.

After the close of evidence, Shah informed the trial court that he had "added two more special instructions" and provided copies of those instructions to Skillz. The court then held a conference to discuss the jury instructions. Although the court briefly referenced the parties' competing versions of CACI No. 303 on the record, it apparently spoke with the parties about that instruction in an off-the-record discussion. Skillz claims that, during that discussion, the court, over Skillz's "strenuous objection", agreed to give a modified version of CACI No. 303 that included the "pretext" language.

Skillz objected to the addition, arguing that Shah never pled a breach of the Performance Grant "in the complaint" and that his new breach claim was actually a claim for breach of the implied covenant—which Shah had already dismissed. Shah countered that the FAC expressly referenced the Performance Grant, that Skillz's witnesses testified about the Performance Grant, and that the Performance Grant contained an express promise to award stock options to Shah. Later, the court, on the record, permitted Shah to include the Performance Grant as the third contract.

The trial court directed the parties to finalize the jury instructions that it had approved, including the modified version of CACI No. 303, and ordered Skillz to produce the final instructions. Later that day, Skillz submitted the parties' joint instructions and special verdict forms. The final version of CACI No. 303 required Shah to prove "[t]hat Skillz breached" each contract "by not allowing Shah to exercise his vested stock options under the pretext that 'cause' existed for his termination." Similarly, the final special verdict forms asked: "Did Skillz breach the [contract] by not allowing Shah to exercise his vested stock options under the pretext that 'cause' existed for his termination?" (Bolding omitted.)

### 2. *The Jury Instructions and Special Verdict Forms Sufficiently Identified the Contractual Obligation Breached by Skillz*

Skillz contends the judgment must be reversed because "neither the jury instructions nor the [special] verdict form identifies an obligation or prohibition in either" the Employment Contract or Notice that was breached.

According to Skillz, the purported breach identified in the instructions and forms—" 'not allowing Shah to exercise his vested stock options under the pretext that "cause" existed for his termination' "—is "divorced from the contracts' terms."

We review this contention de novo and reject it. ( *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325 ( *Saxena* ).) Both the Employment Contract and Notice incorporated by reference the terms of the Plan. The Plan, in turn, established that preventing Shah from exercising his stock options if he was *not* terminated for cause constituted a breach of those contracts. Thus, the instructions and verdict forms conditioned liability on the jury finding that Skillz had committed an act that was, in fact, a breach of its contractual obligations.

"A contract may validly include the provisions of a document not physically a part of the basic contract." ( *Williams Construction Co. v. Standard-Pacific Corp.* (1967) 254 Cal.App.2d 442, 454 ( *Williams Construction* )) " 'For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.' " ( *Ibid.* ) The contract, however, "need not recite that it 'incorporates' another document, so long as it 'guide[s] the reader to the incorporated document.' " ( *Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 54.)

Here, the Employment Contract summarized the terms of Shah's initial stock option grant and stated that this grant would "be subject to and exclusively governed by the terms of" the Plan, the Notice, and the Option Award Agreement. The Notice likewise stated that Shah's initial grant was governed "by the provisions of the Plan and the [Option Award Agreement]" and that both documents "are *incorporated* herein by reference." (Italics added.) Thus, the references to the Plan in both contracts were "clear and unequivocal," and Skillz does not dispute that the terms of the Plan were "known or easily available to the contracting parties." ( *Williams Construction, supra,* 254 Cal.App.2d at p. 454, 61 Cal.Rptr. 912.) To the extent any doubts remain, the Notice itself explicitly incorporated the Plan's terms by reference.

The Plan, in turn, stated that Shah's stock options expired on the date of his termination if he was terminated with cause.

But if Shah was terminated *without* cause, the Plan stated that he had three months from the date of his termination to exercise his options. The Plan then defined "cause" to encompass specific offenses, including a "material breach" of the confidentiality agreement, "gross misconduct or any act which is injurious" to Skillz, as determined by "the Administrator" (the Board).[12] Because these terms were incorporated by reference into the Employment Contract and Notice, Skillz had an obligation under those contracts to allow Shah to exercise his options within three months after his termination if he was not terminated with cause. As a result, and contrary to Skillz's assertion, the jury instructions and special verdict forms—which asked whether Skillz breached the contracts "by not allowing Shah to exercise his vested stock options"—*did* sufficiently identify a contractual obligation that was breached.[13]

[12]  Skillz concedes the Notice "could have been breached [ ] through incorporation of [the Plan]" but argues that the Plan "says that 'cause' exists if the Board determines there is cause ... and the [special] verdict form[s] did not ask the jury whether the Board made a cause determination." As discussed below, even assuming the verdict forms were ambiguous as to whether they required the jury to find a lack of cause, the jury's no unclean hands finding resolves any ambiguity.

[13]  Accordingly, we do not find that the special verdict forms were " ' "fatally defective" ' " as Skillz argues because they "allow[ed] the jury to resolve every controverted issue." (*Saxena, supra,* 159 Cal.App.4th at p. 325, 71 Cal.Rptr.3d 469.)

### 3. *Any Defect in the Jury Instructions or Special Verdict Forms Was Harmless*

Skillz next argues that the inclusion of the term " 'pretext' " in the jury instructions and special verdict forms was improper. According to Skillz, the term " 'pretext' " references Skillz's motive in terminating Shah—which is only relevant to Shah's breach of the implied covenant claim that was dismissed, and not to his breach of contract claim. As a result, the jury could have found Skillz liable for breach of contract solely because Skillz had an improper motive for terminating Shah and not because Skillz lacked cause to do so. In other words, the jury could have found a breach of contract even though Skillz terminated Shah with cause. Skillz contends this error was

prejudicial and warrants a JNOV or, at a minimum, a new trial. We disagree. Assuming for purposes of argument that Skillz did not forfeit this challenge and that the instructions and verdict forms were defective or ambiguous, we find any error harmless based on the jury's rejection of Skillz's unclean hands defense.

"[A] defective verdict form is subject to harmless error analysis." (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1244 (*Taylor*).) Thus, we must affirm, "even in the face of substantial error, if the judgment is 'clearly right.' " (*Id.* at p. 1245). And we will "reverse only when we are of the opinion that there has been a miscarriage of justice." (*Id.* at p. 1246.) Likewise, "[a] judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' " (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) Thus, instructional error, like an error in the verdict form, "is [only] prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Ibid.*; see *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801 ["the so-called *Watson* standard applies generally to all manner of trial errors occurring under California law, precluding reversal unless the error resulted in a miscarriage of justice"].)

Here, it is not probable that the alleged defect in the jury instructions or special verdict forms prejudicially affected the verdict. Because the jury rejected Skillz's unclean hands defense by finding that Shah did not engage in any unethical or dishonest conduct, it could not have found there was cause for Shah's termination.

As to the unclean hands defense, the trial court initially instructed the jury to consider whether Shah "engaged in [any] unethical ... or dishonest conduct, specifically in relation to the Termezy report" and the parties' closing arguments focused on the same. During deliberations, the jury asked the court whether it should limit its consideration of dishonest or unethical conduct to the Termezy report, or whether it could also consider Shah's conduct in relation to the Notice. With the agreement of counsel, the court modified the unclean hands instruction to state: "If you find that Shah engaged in unethical or dishonest conduct specifically in relation to any of the three contracts ... [t]hen that unethical or

dishonest conduct bars Shah from recovering on the claims in
relation to which he engaged in such conduct." After the court
read the revised instruction to the jury, counsel presented
supplemental arguments.

Applying the revised instruction, the jury found that Shah did
not engage in unclean hands. The court subsequently issued a
statement of decision denying Skillz's unclean hands defense.
The court noted, "assuming Shah had an obligation to alert
Skillz about the [vesting schedule] error by Skillz, Shah's
claim of two-year vesting and refusal to sign the correction
letter had no effect on the amount of the verdict." The court
further observed that "no evidence was ever presented that
Shah benefitted or profited in any way from the information
contained in the Termezy report" and that although "Shah
did not always conduct himself honorably ... there is no
evidence that he benefitted from his unethical conduct or that
his 'unclean hands' impacted the verdict."

Skillz contends we cannot rely on the jury's " 'no unclean
hands' " finding to find harmless error because: (1) we cannot
" 'imply findings' from one answer on a special verdict form
to remedy a defect in another question"; and (2) the jury's
finding does not mean it also found that Shah was terminated
without cause. We disagree.

First, it is true that we "may not 'imply findings' to 'save' a
defective special verdict." 🔖 *Taylor, supra,* 222 Cal.App.4th
at p. 1244, 166 Cal.Rptr.3d 676.) But the jury's finding of no
unclean hands, though advisory, was still an *express* finding
that Shah did not engage in any unethical or dishonest conduct
in relation to the three contract claims. Thus, we are relying on
an actual jury finding, rather than implying a finding, to
find harmless error. And contrary to Skillz's contention, this
finding is not being used as the basis for the judgment. Rather,
the finding is being used to show that the jury necessarily
found that Skillz terminated Shah without cause even if the
jury instructions or special verdict forms were defective or
ambiguous as claimed by Skillz. In other words, the jury's
rejection of Skillz's unclean hands defense establishes that the
jury made the requisite finding for a breach of contract claim
against Skillz—that Skillz prevented Shah from exercising
his vested stock options even though Skillz had no evidence
that Shah engaged in any unethical or dishonest conduct. [14]
In relying on an actual jury finding to find harmless error,
we are simply applying the same analysis used in many other

cases. (See, e.g., 🔖 *K.M. v. Grossmont Union High School
Dist.* (2022) 84 Cal.App.5th 717, 770–771; *Adams v. MHC

🔖 *Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 614–615;
🔖 *Gombiner v. Swartz* (2008) 167 Cal.App.4th 1365, 1377.)

[14]      The trial court apparently reached the same
          conclusion as the jury when it rejected Skillz's
          unclean hands defense. As the court stated in its
          written order, although Skillz argued at trial that
          "Shah's misappropriation of the Termezy report
          established cause to terminate Shah", no evidence
          was presented "that Shah shared the [ ] report with
          any outside company or profited from the [ ] report
          in any way."

We also reject Skillz's contention that "the jury's 'no unclean
hands' verdict does *not* mean it found Shah was terminated
without cause" because it "could have found that Shah
violated a company policy ... but believed that Shah was
not morally wrong in doing so." As a threshold matter,
we question whether "unethical" conduct as used in the
unclean hands instruction is limited to conduct that is
morally wrong, particularly where, as here, professional
business conduct is at issue. Indeed, unethical conduct
in that context may also mean "unwilling to adhere to
professional rules of conduct" or "not in accord with the
standards of a profession." (<https://www.dictionary.com/
browse/unethical> [as of April 8, 2024].) Thus, the jury, by
finding that Shah did not engage in unethical or dishonest
conduct, arguably found that Shah did not violate company
policy based on the instructions themselves.

But even if we agree with Skillz's cramped interpretation of
unethical conduct, it is clear that the jury was *never* asked
to consider whether Shah may have been morally right to
take or appropriate the Termezy report—the only cause for
termination asserted by Skillz at trial. Indeed, there is no
reason to believe the jury did, in fact, do so.

First, Skillz never claimed that Shah engaged in unclean
hands for any reason other than dishonesty. Indeed, in its
closing argument, Skillz only argued that the jury should find
unclean hands "if you find that Mr. Shah engaged in *dishonest*
conduct." (Italics added.) Thus, the jury, by rejecting Skillz's
unclean hands defense, necessarily found that Shah did not
act dishonestly by emailing himself the Termezy report.

Second, Skillz, throughout the trial, only argued that Shah
was terminated because he acted *dishonestly* by sending
the Termezy report to himself in violation of Skillz's
confidentiality agreement and policy against theft. For

example, Skills only claimed that it terminated Shah "due to his violation of the Fraud and Theft of Company Property Policy" in its trial brief and opening statement. And in its closing argument, Skillz only argued that it terminated Shah for his "honesty violations," such as his "violation of the company's fraud and theft policy." Indeed, Skillz specifically argued that Shah "took the Termezy data with the intent to use it, which was a violation of Paragraph 2 of the confidentiality agreement." As a result, Skillz contended it "was perfectly justified in determining that that was dishonest, as the plan provided."

That Shah's purported dishonesty in connection with the Termezy report was the sole basis for Skillz's claim it had cause to terminate him is also consistent with the testimony of Chafkin. He testified that downloading a confidential work file, by itself, was not grounds for termination. Instead, he claimed that Shah had no legitimate business reason for sending the report to himself given the circumstances and timing.

Finally, Shah's arguments at trial confirm that he too understood that his alleged dishonesty in emailing the Termezy report to himself was the sole basis for Skillz's claim it had cause to terminate him. For example, in his statement of the case, Shah wrote that Skillz claimed that it had " 'cause' " to terminate him because he had allegedly stolen a single email which they identified as confidential information. He made similar representations in his opening statement. And in his closing argument, Shah explained that whether Skillz breached any contracts came down to one "primary" question: Did Shah "by sending the Termezy report to his personal e-mail account commit theft?"

Because Skillz only asked the jury to find unclean hands *and* cause to terminate Shah based on his alleged dishonesty in taking the Termezy report for illegitimate purposes, the jury's finding that Shah did not engage in unclean hands means that the jury necessarily found that Skillz lacked cause to terminate him. Any ambiguity caused by the "pretext" language in the instructions or verdict forms therefore was not prejudicial. [15]

15    Under the terms of the Plan, Shah had the right to "exercise" his vested stock options "upon [his] Termination Date." Thus, even assuming Skillz had cause to terminate Shah, Skillz arguably breached the contracts by refusing to allow Shah to exercise

his vested stock options after Shah told Chafkin that he wanted to do so at his termination meeting.

**B. Shah's Procedural Challenge to the New Trial Orders**

Before we address the parties' substantive challenges to the damage award, we consider Shah's procedural challenges to the new trial orders and remittitur. On April 25, 2022—the last day it could rule on Skillz's motion for new trial under Code of Civil Procedure section 660 [16] —the trial court denied Skillz's motion for a new trial conditioned on Shah's acceptance of a remittitur for $6,694,000, the alternative amount of damages calculated by Skillz's expert based on all of Shah's stock options, including the Performance Grant. The amount of the remittitur, however, was erroneous because the court's order also stated it was "not including the damages for the breach of the Performance Contract which Skillz argues was not properly pled." Skillz promptly brought this error to the court's attention, and the court issued an amended order the next day that corrected the remittitur to $4,358,358. The amended order made no other substantive changes. Shah contends both new trial orders are invalid because they lack the required statement of grounds and specification of reasons. This contention lacks merit.

16    All further statutory references are to the Code of Civil Procedure unless otherwise specified.

Under section 657, the trial court must "specify the ground or grounds upon which [a new trial] is granted and the court's reason or reasons for granting the new trial upon each ground stated." Notwithstanding Shah's assertions to the contrary, we find that both new trial orders adequately specified the grounds and reasons for their respective remittiturs.

The parties agree that the only applicable statutory ground for the trial court's remittitur was "excessive damages." (See § 657, subd. (5).) Shah, however, contends the new trial orders are invalid because they do not explicitly state "excessive damages" as the ground for relief. But inclusion of that statutory language "is not invariably required; the ground for a new trial is adequately specified if the intention of the court is clear." (*Jones v. Citrus Motors Ontario, Inc.* (1973) 8 Cal.3d 706, 709–710.) And the court's intention here was clear from its orders: it was issuing a remittitur based on excessive damages. First, the court expressly stated that it would consider granting a new trial "as to damages *only*." (Italics added.) It then reduced the jury's award from $11.5 million to $6.7 or $4.4 million. Second, the court referenced Shah's acceptance of the remittitur pursuant to

section 662.5, subdivision (a)(2), which solely governs orders granting a new trial based on excessive damages. Thus, it is clear that the court, notwithstanding its failure to use the words "excessive damages," intended to conditionally grant a new trial on that ground.

The new trial orders also adequately stated the reasons why the trial court found the jury's award of $11.5 million to be excessive. The statement of reasons in a new trial order "should be specific enough to facilitate appellate review and avoid any need for the appellate court to rely on inference or speculation." ( *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 634.) However, the judge need only "furnish[ ] a concise but clear statement of the reasons why he finds one or more of the grounds of the motion to be applicable .... No hard and fast rule can be laid down as to the content of such a specification, and it will necessarily vary according to the facts and circumstances of each case." ( *Mercer v. Perez* (1968) 68 Cal.2d 104, 115.)

Here, the trial court explained that the "appropriate date to value the loss of stock options remains an unsettled area of law" that was "complex" and "might have been confusing to the jury." It then conceded that "more instruction on the valuation of the stock options was probably necessary" and, for this reason, granted a new trial "as to damages only." More specifically, the court found that "the appropriate measure of damages" came from Skillz's expert, rather than Shah's expert as determined by the jury. Although both experts calculated damages based on the value of Skillz stock after the IPO, Skillz's expert used the average value of the stock over roughly 90 days after the lock-up period ended. By contrast, Shah's expert used the value of Skillz stock at the early release date and its average value during the two weeks after the lock-up period ended. In light of this clear testimony from the experts highlighting the differences in methodology they used to calculate damages, the court's order furnished a sufficiently clear explanation for its rejection of the jury's verdict as excessive. It also provided a clear and concise reason for excluding any damages suffered by Shah for the loss of stock options awarded under the Performance Grant: those damages were "not properly pled." Thus, the court's order is specific enough for appellate review and satisfies the requirements of section 657.

End of Unpublished Text

C. The Appropriate Measure of Damages

We now turn to the parties' challenges to the measure of damages used by the trial court to determine the remittitur. At trial, the court left "the appropriate date or approximate time period to value the stock options" for the jury to determine. But in deciding Skillz's new trial motion, the court acknowledged that it may not have provided sufficient instruction to the jury on the appropriate measure of damages. As a result, the court issued a remittitur that adopted the alternative calculation of Shah's damages proffered by Skillz's expert. For that calculation, Skillz's expert assumed that Shah's lost stock options should be valued after the lock-up period ended, rather than as of the date of breach. Skillz's expert then used the average price of Skillz stock from June 14, 2021 (the date the lock-up period ended) to September 8, 2021 (the day before the expert's testimony) to calculate Shah's damages. Based on that average price, Skillz's expert determined that Shah suffered approximately $4.4 million in damages from the loss of his initial grant of options and $2.3 million in damages from the loss of his options under the Performance Grant. Thus, to the extent the court may have erred by letting the jury decide the appropriate measure of damages, it corrected that error through its remittitur, and we now consider whether the measure of damages adopted in the remittitur is erroneous.

Both parties argue that the trial court erred by adopting the measure of damages used by Skillz's expert in his alternative calculation. Not surprisingly, they disagree on the remedy for this error. Skillz contends we should either order a JNOV and award Shah the amount of damages calculated by Skillz's expert as of the date of breach or "order a new damages trial." By contrast, Shah contends we should reinstate the jury verdict. Applying de novo review ( *Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 691, 21 Cal.Rptr.3d 732 ( *Toscano*) ["the determination of whether [a plaintiff] is entitled to a particular measure of damages is a question of law subject to de novo review"]), we disagree with both parties and affirm the measure of damages used by the court in the remittitur.

**\*187**  1. *Skillz's Challenges to the Measure of Damages Adopted by the Trial Court in the Remittitur*

Skillz argues that the value of Shah's lost stock options should have been measured as of the date of breach—i.e., the date of Shah's termination in 2018. Skillz further argues that, even if Shah's damages may be measured after the date of breach, the court should not have used the price of Skillz stock during a period of time after the lock-up period ended because there is

no objective evidence Shah would have held onto his shares until then. We are not persuaded.

As a threshold matter, we consider what law should be applied in determining the date on which Shah's damages are measured. At trial, both parties assumed that California law controlled, and neither argued that Delaware law governed the measure of damages. But in its reply brief, Skillz asserted for the first time that "Delaware law governs the Plan"—which, in turn, governed Shah's stock options. In support, Skillz cited to section 12.4 of the Plan—which stated that it "and all agreements hereunder shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to that body of laws pertaining to conflict of laws." By choosing to invoke this choice-of-law provision that it drafted, Skillz appears to have conceded that Delaware law should "govern the 'measure of recovery for a breach of contract' " in this case. (*Airs Aromatics, LLC v. CBL Data Recovery Technologies Inc.* (2020) 50 Cal.App.5th 1009, 1014, 264 Cal.Rptr.3d 578 (*Airs Aromatics*).)

[1] Despite this apparent concession, Skillz now contends this court should not apply Delaware law because Shah has "waived enforcement of the choice-of-law provision" in the Plan. Skillz presumably does so because it believes that Delaware law is less favorable to its position on damages than California law. But Skillz's attempt to have its cake and eat it too, by cherry-picking the applicable law, makes no difference here. Under both California and Delaware law, damages for lost stock options in a breach of contract action may be measured from a date other than the date of breach based on equitable considerations, including whether a reasonably available market for the stock exists at the time of breach. We therefore reject Skillz's challenges to the remittitur.

*i. Under California law, breach of contract damages for lost stock options need not be measured as of the date of breach*

Skillz argues that "California law requires Shah's stock options be valued as of the date of the alleged breach." (Bolding omitted.) Skillz therefore contends Shah's damages are limited to the difference between the exercise price of his vested stock options and the value of Skillz stock at the time of his termination, i.e., the date of breach. We disagree.

[2] [3] California courts have long recognized that " '[t]he rules of law governing the recovery of damages

for breach of contract are very flexible.' " (*Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 455, 277 Cal.Rptr. 40 (*Brandon & Tibbs*).) Under California contract law, "the theory is that the party injured by a breach should receive nearly as possible the equivalent of the benefits of performance. [Citations.] The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised." (*Ibid.*) Accordingly, California law generally permits recovery of damages "which might have been reasonably contemplated or foreseen by both parties at the time they made the contract, as the probable **\*188** result of the breach." (*Id.* at pp. 455–456, 277 Cal.Rptr. 40.)

[4] [5] [6] Consistent with these principles, California law has long recognized that damages in breach of contract actions involving "personal property" (unlike real property) need not be determined as of the date of breach. (*Royer v. Carter* (1951) 37 Cal.2d 544, 549, 233 P.2d 539.) Indeed, Civil Code section 3353 requires that for the sales of some personal property, "the value of the property is to be determined, *not as of the date of the breach of the contract, but as of such time thereafter 'as would have sufficed with reasonable diligence for the seller to effect a resale.'* " (*Ibid.,* italics added) And even where no California statute requires that contract damages be measured as of a date other than the date of breach (*Sackett v. Spindler* (1967) 248 Cal.App.2d 220, 235, 56 Cal.Rptr. 435 (*Sackett*) [Civil Code section 3353 does not apply to contracts involving sales of stock]), " '[t]he general rule that the measure of damages is the difference between the contract price and the market value [at the time of breach] is not a hard-and-fast rule, but may be varied *if circumstances require it*' " (*id.* at p. 236, 56 Cal.Rptr. 435, italics added). In particular, the rule does not apply " 'where a better method of measuring loss or damages is available under the circumstances,' " such as "when there is no market available at the time and place of performance." (*Ibid.*)

That damages for breach of a contract involving personal property like stock options need not be measured as of the date of breach under California law is further confirmed by Civil Code section 3306. That section states that "the *detriment* caused by the breach of an agreement to convey *an estate in real property* is deemed to be ... the difference between the price agreed to be paid and the value of the estate agreed to be conveyed *at the time of breach*." (Italics added.) The

absence of a similar provision for the breach of an agreement to convey any other types of property further suggests that California law is not as rigid on damages in breach of contract actions as argued by Skillz. Otherwise, the quoted language in Civil Code section 3306 would serve no purpose.

This is aptly illustrated by *Sackett*. In that case, the court of appeal was tasked with how to measure breach of contract damages after a buyer failed to complete an agreed-upon purchase of stock in a newspaper. After the buyer reneged on the deal, the seller (the owner of the newspaper) sold the stock to a third party almost a year later at a much lower price than the contract price. (*Sackett, supra*, 248 Cal.App.2d at pp. 225–227, 56 Cal.Rptr. 435.) The seller then sued the buyer for breach of contract and prevailed. (*Id.* at p. 224, 56 Cal.Rptr. 435.) In calculating the seller's damages, the trial court used the original contract price and subtracted "all sums of money received by him from" the buyer and the "net proceeds" received by the seller from his subsequent sale of the stock one year later. (*Id.* at p. 232, 56 Cal.Rptr. 435.) The buyer appealed, "contend[ing] that the [ ] court erred in measuring damages by the difference between the contract price for the stock and the price at which [the seller] ultimately resold the stock to a third party." (*Ibid.*) According to the buyer, the seller's damages should be the difference between the contract price and the stock's value as of the date of breach. (*Ibid.*)

The court of appeal disagreed. The court acknowledged that, as a "general rule," "the measure of damages for breach of a contract to accept and pay for the stock is the difference between the contract price and the market price at the time and place of delivery." (*Sackett, supra*, 248 Cal.App.2d at p. 235, 56 Cal.Rptr. 435.) But it **\*189** concluded that this rule should not apply where, as here, "there is no market available at the time and place of performance." (*Id.* at p. 236, 56 Cal.Rptr. 435.) Instead, "resort may be had to the market of the goods at the nearest available market." (*Ibid.*) "[A]nd in the absence of an available market, ... the measure of damages may be ... the actual damages naturally and directly resulting from the buyer's breach." (*Ibid.*) Moreover, even where there is an available market for the stock, " '[t]he general rule that the measure of damages is the difference between the contract price and the market value' " at the time of breach may not apply. (*Ibid.*) Applying these principles, the court of appeal, after considering events that occurred after the breach, concluded that "the trial court could properly conclude that there was no available market for the stock at the time of [the buyer's] breach." (*Ibid.*) The court reached this conclusion even though the seller was able to sell the stock after the

breach, because the publicization of the purchase agreement made resale extremely difficult for the seller after the buyer breached the agreement. (See *id.* at pp. 236–237, 56 Cal.Rptr. 435 [testimony that the seller was "extremely fortunate to sell his stock" after the breach "tends to show the unavailability of a market for the stock at the time of the breach"].) The court of appeal therefore held that the trial court properly refused to measure damages using the market value of the stock as of the date of breach. (*Id.* at p. 237, 56 Cal.Rptr. 435.)

In accordance with the principles of contract damages described in *Sackett*, at least one court of appeal has held that damages for the loss of stock options due to the breach of a contract may be measured as of a date other than the date of breach based on equitable considerations. In *Bertero*, the plaintiff filed an action for declaratory relief "with respect to the rights and duties of himself and the defendants to three written contracts." ( *Bertero, supra*, 254 Cal.App.2d at p. 129, 62 Cal.Rptr. 714.) In two of those contracts, the plaintiff received "options to purchase stock of his employer," the defendant. ( *Ibid.*) The trial court found "the options to be 'valid, subsisting and enforceable' " and gave the defendant "the choice of either stipulating that [the options] should be extended so that [the plaintiff] should be accorded the benefit of a full seven-year term as to each, or of paying damages for their breach in the amount found by the trial court." ( *Id.* at p. 133, 62 Cal.Rptr. 714.)

In calculating the damages caused by the loss of the stock options, the trial court did not use the price of the defendant's stock on March 29, 1962, the date of breach. (See *Bertero, supra*, 254 Cal.App.2d at p. 140, 62 Cal.Rptr. 714 [the defendant wrongfully terminated the plaintiff's stock options on March 29, 1962].) Instead, it apparently found that the plaintiff would have exercised his options several years later and used the price of the defendant's stock as of that later date to calculate the plaintiff's damages. [17] (See **\*190** *id.* at p. 149, 62 Cal.Rptr. 714.) In affirming the trial court's "alternative award for money damages with respect to the stock options," the court of appeal held that the trial court properly considered the equities, including "events occurring up to the time of judgment," to determine "the ascertainable value of the options." ( *Id.* at p. 150, 62 Cal.Rptr. 714.) Moreover, the court of appeal held that " '[o]ne whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages

could not be measured with exactness.' " ( *Id.* at p. 151, 62 Cal.Rptr. 714.)

17    In an unreported decision, a federal district court declined to apply *Bertero* in determining damages in a breach of contract action involving an option in a lease agreement because *Bertero* "is not a traditional breach of contract case." ( *First Natl. Mortgage Co. v. Federal Realty Investment Trust* (N.D.Cal. Sept. 12, 2005) 2005 WL 2206698, *5, 2005 U.S. Dist. Lexis 34285, *16 ( *First Natl.*).) Of course, that federal decision is not binding on this court. ( *Ram's Gate Winery, LLC v. Roche* (2015) 235 Cal.App.4th 1071, 1080, 185 Cal.Rptr.3d 935.) In any event, we do not find it persuasive. Although *Bertero* involved a claim for declaratory relief, the trial court's alternative award of damages was undoubtedly based on the damages suffered by the plaintiff due to the defendant's breach of contract. Indeed, notwithstanding the federal district's assertion to the contrary (see *First Natl.*, at p. *5, 2005 U.S. Dist. Lexis 34285, at p. *16 ["Neither court ... discussed substantive breach of contract damage principles"]), *Bertero* expressly relied upon fundamental principles of contract damages in affirming that damage award (see *Bertero, supra,* 254 Cal.App.2d at pp. 147, 62 Cal.Rptr. 714 ["The employment agreement continued in full force and effect and defendants cannot, by their own wrongful act, deprive [the plaintiff] of that which had been bargained for: the opportunity to share in the successes of [the defendant] over a specified period of time"].) Moreover, as explained above, the reasoning of *Bertero* appears to be consistent with California law governing contractual damages. (See, *supra*, at pp. 187–89.)

[7]    Finally, measuring damages for lost stock options as of a date other than the date of breach if, for example, there is no market available for the stock at the time of the breach comports with the theory behind contract damages. As the Third Circuit explained in *Scully v. US WATS, Inc.*

(3d Cir. 2001) 238 F.3d 497, 510 ( *Scully*), the contract theory of damages "presume[s] that a plaintiff has the ability to 'cover,' in other words, mitigate damages by protecting prospective profit, by *entering the market* to purchase the lost shares." ( *Ibid.,* italics added.) Based on this presumption, the contract theory "puts the onus on a plaintiff to cover *immediately upon the breach*." ( *Ibid.,* italics added.) Thus, when the plaintiff is, in theory, able to purchase his lost shares at the time of the breach, contract "damages are fixed as of the breach date." ( *Ibid.*)

[8]    But that reasoning no longer applies if there is no available market for the stock at the time of breach because the plaintiff cannot cover his damages by purchasing the lost shares immediately upon the breach. In that circumstance, "the blurring between conversion and breach of contract remedies may be justified" as suggested by *Scully, supra,* 238 F.3d at page 512, because "[t]he conversion theory extends the cover date to a 'reasonable time' into the future" when the plaintiff could have mitigated the damages caused by the breach ( *id.* at p. 510). This, in turn, "allows a plaintiff to recover, to a limited extent, a relevant benefit of his bargain, namely the prospect of future profits which provide the fundamental underpinning to stock options" granted to employees of startups like Skillz. ( *Ibid.*; see *Bertero, supra,* 254 Cal.App.2d at p. 141, 62 Cal.Rptr. 714 [the "unique value" of stock options comes from the ability of option holders to profit when the sale price of the stock exceeds the exercise price of the option].) Indeed, measuring damages from the date of breach, rather than a date in the future, in cases where there is no market for the stock at the time of the breach does not "achieve the requisite end of putting" the nonbreaching party "in the position most closely reflecting the one he would have held absent [the] breach." ( *Scully,* at p. 512.)

*Moser v. Encore Capital Group, Inc.* (S.D. Cal. 2012) 964 F.Supp.2d 1224 ( *Moser*) reinforces this conclusion. In *Moser,* the federal district court acknowledged **\*191** that "valuing stock options on the date of the breach is typically preferable to utilizing a valuation date that is based solely on a plaintiff's speculation as to when he 'would have' exercised his options." ( *Id.* at p. 1226.) However, the court also recognized that "[a] valuation date subsequent to the breach may ... be appropriate in certain limited circumstances where 'adequate evidence confirm[s] a plaintiff's professed intent concerning

the exercise' of his stock options." (*Ibid.*) For example, "if a plaintiff presents credible, convincing evidence that he would have exercised his options on a specific date, then a court may use that date as the valuation date." (*Id.* at p. 1227.) That evidence should "indicate[ ] that [the plaintiff's] intent to sell on a particular date was formulated before he had the benefit of hindsight." (*Id.* at p. 1228; see 🚩 *Scully, supra,* 238 F.3d at pp. 512–513 ["in the absence of a district court's express credibility finding or other convincing evidence," we "cannot accept a plaintiff's after-the-fact assertion that he would have sold stock at a time that, in hindsight, would have been particularly advantageous"].) Under this reasoning, evidence that the plaintiff had little or no ability to sell his stock at the time of the breach would appear to justify a valuation date after the date of breach.

The California cases cited by Skillz do not compel a contrary conclusion. In 🚩 *Maughan v. Correia* (2012) 210 Cal.App.4th 507, 148 Cal.Rptr.3d 593 (🚩 *Maughan*) and 🚩 *Ryan v. Crown Castle NG Networks, Inc.* (2016) 6 Cal.App.5th 775, 211 Cal.Rptr.3d 743 (🚩 *Ryan*), there was no dispute that damages for the lost stock options should be measured as of the date of breach. (See 🚩 *Maughan,* at p. 519, 148 Cal.Rptr.3d 593 ["The parties agree that the measure of Maureen's damages for Maurice's breach of contract is the difference between the fair market value at the time of the breach of the additional RHI stock Maureen sought to purchase, and the agreed upon option price for that stock"]; 🚩 *Ryan,* at p. 788 ["Defendant did not contest any of the variables used by plaintiff's expert to calculate" the value of the stock options].) Thus, neither case resolved the issue presented here. (See *In re Noah S.* (2021) 67 Cal.App.5th 410, 416, 282 Cal.Rptr.3d 204 [" 'Cases are not authority ... for issues not raised and resolved' "].)

The same is true for 🚩 *Peek v. Steinberg* (1912) 163 Cal. 127, 124 P. 834 (🚩 *Peek*). In 🚩 *Peek,* the plaintiff "was to receive 'paid up stock in said corporation to the amount of $12,000' " under the agreement at issue. (🚩 *Id.* at p. 133, 124 P. 834.) Construing that term of the agreement, our high court concluded that the plaintiff was not entitled "to receive stock actually worth twelve thousand dollars, but merely to have stock of the nominal or par value of twelve thousand dollars issued to him." (*Ibid.*) It then held that "[t]he measure of damages for the failure to issue the stock would, then, be ...

the actual value of the stock at the time when [the plaintiff] should have received it." (🚩 *Id.* at p. 134, 124 P. 834.) But in reaching this conclusion, our high court did not consider the equities or any events occurring after the breach because the parties apparently presented none. (See 🚩 *id.* at p. 134, 124 P. 834 ["The record discloses no substantial evidence tending to show with any approach to accuracy the value of stock in the defendant corporation"].) Thus, the court had no occasion to consider whether damages should have been measured as of a date other than the date of breach based on equitable considerations. (See *In re Noah S., supra,* 67 Cal.App.5th at p. 416, 282 Cal.Rptr.3d 204.)

In sum, under California law, Shah's damages are *not* limited to the difference between the exercise price of his stock options and the value of Skillz stock on or **\*192** near the date of his termination (date of breach).

> *ii. Under California law, Shah's damages*
> *were properly measured using the price of*
> *Skillz stock after the lock-up period ended*

**[9]    [10]**    Skillz contends that even assuming California law allows a valuation date other than the date of breach, Shah's damages still should have been calculated as of the date of breach using the value of Skillz stock on or near the date of his termination. We disagree. Although damages in breach of contract actions, as a general rule, should be measured from the date of breach under California law, that rule does not apply where, as here, there is no readily available market for the stock at the time of the breach.

At the time of Shah's termination, shares of Skillz, a private company, could not be sold on the open market. Indeed, there was *no* public market for those shares until the IPO. And to the extent there was a market for Skillz stock, it was, at best, extremely limited. As a result, measuring damages using the value of Skillz stock on the date of breach is not appropriate. (See *Sackett, supra,* 248 Cal.App.2d at p. 236, 56 Cal.Rptr. 435 [general rule measuring contract damages as of the date of breach does not apply "when there is no market available" on that date].) Indeed, the presumption underlying the measure of damages proposed by Skillz—that Shah could have covered his potential losses by purchasing his lost shares "immediately upon the breach"—is simply inapplicable here. (🚩 *Scully, supra,* 238 F.3d at p. 510.)

Some "blurring between conversion and breach of contract remedies" is therefore justified in this case. (📖 *Id.* at p. 512.)

More significantly, measuring Shah's damages from the date of breach ignores what was "reasonably contemplated" by Shah when he joined Skillz and entered into the contracts. (📖 *Brandon & Tibbs, supra,* 226 Cal.App.3d at pp. 455–456, 277 Cal.Rptr. 40.) As Shah explained, "[w]hen you join a startup, you join it with the hope that it goes public and you're able to participate alongside the company's success." "[M]any talented individuals [choose] to work for a startup company for a below-market cash salary with a substantial stock option grant, dreaming of cashing out for a large sum of money after the startup's IPO." (*Unicorn Stock Options, supra,* 2019 Colum. Bus. L.Rev. at p. 117.) Indeed, Chafkin himself confirmed that this was true for former Skillz employees. As he explained, "former [Skillz] employees [who had been terminated] are some of the best shareholders" of Skillz stock because "they tend to be real believers in the mission ...."

Thus, calculating Shah's damages as of the date of breach does not compensate him for the damages that were "reasonably contemplated or foreseen by both parties, at the time they made the contract." (📖 *Brandon & Tibbs, supra,* 226 Cal.App.3d at pp. 455–456, 277 Cal.Rptr. 40.) We therefore reject Skillz's proposed measure of damages using the value of Skillz stock on or near the date of Shah's termination. And because Skillz proposed no *other* measure of Shah's damages at trial or in its appellate briefs aside from the alternative calculation provided by its expert at trial (which merely responded to the calculation provided by Shah's expert), it is now stuck with that calculation.

**[11]** But even if Skillz had proposed another alternative measure of damages, using the price of Skillz stock after the lock-up period ended, as the trial court did in the remittitur, still appears appropriate because it is "nearly as possible the equivalent of the benefits of performance."

**\*193** (📖 *Brandon & Tibbs, supra,* 226 Cal.App.3d at p. 455, 277 Cal.Rptr. 40.) This is because Shah was free to sell *for the first time and without any limitations* any and all Skillz stock that he would have acquired if he had been allowed to exercise his stock options upon his termination on the date the lock-up period ended. Thus, the remittitur properly measured Shah's damages from that date, rather than the date of breach, under California law.

A contrary ruling under these circumstances would allow a private startup company to take away stock options earned by a terminated employee with relative impunity before the company has been sold or goes public because the financial consequences of doing so would be negligible. We are aware of no California case law that contemplates such an inequitable result solely because the employee is limited to breach of contract damages.

**[12]** Skillz counters that Shah's damages should not be calculated from the date the lock-up period ended because Shah could have sold Skillz stock in secondary markets before the IPO. But Skillz never argued at trial that Shah's damages should be calculated based on the value of Skillz stock in these secondary markets. It has therefore forfeited the argument. (See *Miller v. Pacific Gas & Electric Co.* (2023) 97 Cal.App.5th 1161, 1170, 316 Cal.Rptr.3d 183 ["an appellate court will generally not consider an issue presented for the first time on appeal that could have been but was not presented in the trial court"].)

**[13]** In any event, there is ample evidence that Shah would not have sold his Skillz stock in a secondary market before the IPO. Shah testified that he would not have done so and did not research whether other Skillz employees had done so. Further, Skillz presented no evidence that Shah could have availed himself of these markets. Although Paradise testified about their existence, he did not explain how Shah could have accessed them and had no idea how many Skillz employees sold their shares in those markets. Indeed, Paradise himself did not sell any of his shares in secondary markets. Chafkin testified that Skillz facilitated some secondary sales by asking "people *inside the company* if they wanted to participate in the transaction" and "enabled them to sell a portion of their stock." (Italics added.) But Chafkin did not explain how Shah, a *former* employee, would have participated in those sales.

Moreover, Shah provided "credible, convincing evidence" that he would not have sold any Skillz stock before the IPO even if he lacked "the benefit of hindsight." (*Moser, supra,* 964 F.Supp.2d at pp. 1227–1228.) First, the absence of a readily available market for Skillz stock before the IPO strongly supports Shah's claim that he would not have sold his Skillz stock in any secondary market. Second, Shah's testimony that he would have followed the lead of Chafkin, Paradise, and most other Skillz employees who did not sell their Skillz stock before the IPO provides additional "objective" evidence that Shah was "not simply picking an advantageous date with the benefit of hindsight." (*Id.* at

Shah v. Skillz Inc., 101 Cal.App.5th 285 (2024)

320 Cal.Rptr.3d 175, 2024 Daily Journal D.A.R. 3094

p. 1229 [evidence that the plaintiff would have followed the lead of his "guru" and other "insiders" is sufficient to support his claim that he would have sold the stock at a date other than the date of breach].) Third, Shah's willingness to accept Skillz stock and forgo any monetary remuneration as compensation for consulting work immediately before his termination provides further evidence that he believed in the company and its prospects for sale or an IPO. Finally, Chafkin's testimony that terminated Skillz employees were "some of the best shareholders" and "real believers in the mission" of Skillz indicates that Shah's claim that he would not have sold **\*194** his stock in any secondary market was credible. Thus, the trial court did not err by ignoring these secondary markets in determining the remittitur amount.

 **[14]**  Skillz also attacks an underlying finding behind the trial court's remittitur—that Shah would have exercised all of his vested stock options within 90 days of his termination as permitted by the Plan. According to Skillz, Shah did not present sufficient evidence that he would have done so. We disagree. Shah told Chafkin that he wanted to exercise his options on the day he was terminated. Even after Chafkin told Shah that his options had been forfeited because he had been terminated for cause, Shah "tried to exercise a small portion of" his options approximately one month later when he did not receive anything in writing from Skillz about the forfeiture of his options. This time Skillz notified Shah in writing that his options were void under his stock option agreement. This is more than enough evidence to support the jury's finding that Shah would have exercised all of his options within three months of his termination. (See *Padideh v. Moradi* (2023) 89 Cal.App.5th 418, 446, 305 Cal.Rptr.3d 906 ["Our substantial-evidence review begins and ends with our ascertaining that there is sufficient evidence in the record, contested or uncontested, to support the jury's verdict and its implied finding[s]"].)

 **[15]**  In any event, Skillz, through its breach, rendered futile any attempt by Shah to exercise his stock options after his termination. Thus, the trial court properly assumed that Shah would have exercised all of his options in calculating Shah's damages. (See ⚑*Oldenkott v. American Electric Inc.* (1971) 14 Cal.App.3d 198, 203–204, 92 Cal.Rptr. 127 [jury may "premise the damage caused by the loss of the option right upon the probable" losses the "plaintiff might have recovered under the contract were he permitted to exercise the option" because the defendant deprived him of that right].)

Accordingly, we find that, under California law, the trial court did not err by declining to measure Shah's damages as of the date of breach using the value of Skillz stock at the time of Shah's termination. In doing so, we reject Skillz's only proposed alternative to the measure of damages adopted by the court in the remittitur. We therefore find that the court properly used the price of Skillz stock after the lock-up period ended—when Shah was free to sell that stock for the first time on the open market like any other former and current employee of Skillz—to calculate his damages.

> *iii. Under Delaware law, Shah's damages should also be measured as of a date other than the date of breach*

By arguing that Delaware law governs under the choice-of-law provision that it drafted, Skillz appears to have conceded that Delaware contract law may be applied here. (*Airs Aromatics, supra,* 50 Cal.App.5th at p. 1014, 264 Cal.Rptr.3d 578.) Indeed, Skillz's only argument against the application of Delaware law—that Shah waived enforcement of that choice-of-law provision—appears dubious at best. Although Shah did not rely on Delaware law below or initially on appeal, there is no evidence that Shah deliberately rejected Delaware law or strategically chose California law over Delaware law. (See ⚑*Weber, Lipshie & Co. v. Christian* (1997) 52 Cal.App.4th 645, 659, 60 Cal.Rptr.2d 677.) Nor does Skillz argue otherwise. Given that Skillz chose Delaware law when it drafted the Plan and invoked Delaware law when it benefitted from it, Skillz can hardly complain that it is unfair for Shah or this court to invoke Delaware law too. (See ⚑ **\*195** *Applera Corp. v. MP Biomedicals, LLC* (2009) 173 Cal.App.4th 769, 792, 93 Cal.Rptr.3d 178.) And by selectively invoking California or Delaware law when that law was more favorable to its position, Skillz has arguably given this court discretion to apply either state law in affirming the remittitur.

 **[16]**  We, however, have no need to exercise that discretion here because, under Delaware law as well, Shah's damages should not be measured as of the date of breach using the value of Skillz stock on his termination date. Indeed, longstanding Delaware precedents establish that damages for lost stock options in a breach of contract action may be measured as of a date other than the date of breach based on equitable considerations. Moreover, the stock price used to calculate damages for lost stock options need not be the price on the date of breach under Delaware law even when damages

are measured from that date. This is because Delaware courts regularly apply "a variation of the formula used in conversion cases" in breach of contract actions involving lost stock options. (🚩*American General Corp. v. Continental Airlines Corp.* (Del.Ch.Ct. 1992) 622 A.2d 1, 8 (🚩*American General*).)

The Delaware Chancery Court made this clear over 30 years ago. In 🚩*American General*, American General Corporation (AGC), entered into a loan agreement with Continental Airlines Corporation (Continental). (🚩*American General, supra,* 622 A.2d at p. 3.) Under that agreement, AGC received, among other things, warrants permitting it to acquire a certain number of shares of Continental at a specified exercise price. (🚩*Ibid.*) After Continental filed for bankruptcy, it merged with Texas Air Corporation (Texas Air). (🚩*Ibid.*) Under the merger, Continental employees received an option to buy a certain amount of Texas Air stock for every share of Continental stock they owned. (🚩*Id.* at p. 4.) Continental and Texas Air did not, however, give this same option to AGC, and the Delaware court found that Continental and Texas Air breached the loan agreement by failing to do so. (🚩*Id.* at p. 3.) Although the date of breach was the date of the merger, the court held "it would not be *equitable* to measure damages from that date." (🚩*Id.* at p. 7, italics added.) Instead, the court held that damages should be measured as of the date the merger was approved by stockholders because the "option was not 'issued or payable' " until then. (🚩*Ibid.*)

More notably, the Delaware Chancery Court applied the " 'highest intermediate value formula,' " a "*conversion* formula of damages," to calculate the damages suffered by 🚩AGC. (*American General, supra,* 622 A.2d at p. 8, italics added.) As the court explained, "a plaintiff's damages are generally measured by what is necessary to put it in as good a position as it would have occupied had there been full performance of the contract." (🚩*Ibid.*) Because "[t]he defendant's acts prevent[ed] [the] court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable," " 'fundamental justice requires that, as between [the plaintiff] and [the defendant], the perils of such uncertainty should be "laid at [the] defendant's door." ' " (🚩*Id.* at p. 10.)

During the three decades since 🚩*American General* was decided, Delaware courts have regularly followed it. For example, these courts have applied the conversion measure of damages used in 🚩*American General* to calculate damages in breach of contract actions involving similar properties like stocks. (See, e.g., *Diamond Fortress Technologies, Inc. v. EverID, Inc.* (Del.Sup.Ct. 2022) 274 A.3d 287, 307–308 (*Diamond Fortress*) [applying the "New York rule" adopted by 🚩*American General* in a breach of contract action involving "the wrongful conversion of stock or properties **\*196** of like character"]; 🚩*Duncan v. Theratx, Inc.* (Del. 2001) 775 A.2d 1019, 1022–1023 (🚩*Duncan*) [applying the highest intermediate value framework to calculate damages in a breach of contract action involving wrongful restrictions on the sale of stock].) Thus, 🚩*American General* and its holding relevant to our decision in this case—that courts may measure damages from a date other than the date of breach in breach of contract actions involving stocks or stock options based on equitable considerations—appears to be well-established under Delaware law.

In any event, even when damages are measured from the date of breach, Delaware courts have declined to use the stock price at the date of breach to determine the value of lost stock options. In *Comrie v. Enterasys Networks, Inc.* (Del.Ch.Ct. 2003) 837 A.2d 1 (*Comrie*), the plaintiffs entered into an agreement with the defendant that, among other things, granted the plaintiffs options to purchase shares in a subsidiary of the defendant. (*Id.* at pp. 10–11.) The stock options were granted pursuant to a vesting schedule, and any unvested options were extinguished if the plaintiff was terminated by the defendant. (*Id.* at p. 11.) Upon termination, each plaintiff had 90 days to exercise any vested options. (*Ibid.*) The agreement further provided that, if the defendant decided not to conduct an IPO for the subsidiary, then the plaintiffs would receive "equivalent substitute or replacement awards" or a set amount of cash. (*Id.* at p. 10.) The defendant decided not to pursue an IPO for the subsidiary and converted the plaintiffs' options for shares of stock in the subsidiary into options for shares of stock in the defendant on August 24, 2001. (*Id.* at p. 11.) The monetary value of those new stock options, however, was far less than the value of the original options at the time the parties entered into the agreement. (*Id.* at pp. 11–12.) The plaintiffs sued the defendant for breach of contract, and the Delaware Chancery Court found that the

defendant "breached its obligations under the" agreement. (*Id.* at p. 17.)

To calculate the plaintiffs' damages, the Delaware court used the date of the breach—August 24, 2001—to determine the "equivalent" options in the defendant's stock that the plaintiffs should have received under the agreement. (*Comrie, supra,* 837 A.2d at p. 19.) But to calculate the damages caused by the loss of those options, the court "consider[ed] events that took place after the date [of breach] in order to aid in its determination of the proper expectations [of the plaintiffs] as of the date of breach." (*Id.* at p. 20.) As a result, the court did not use the price of the defendant's stock at the time of breach to determine the plaintiffs' damages. Instead, the court, applying the same conversion formula used in *American General,* used the "highest intermediate price" of the defendant's stock during the 90-day period after the plaintiffs could have exercised the new options to calculate their damages. The court chose this 90-day period because the plaintiffs " 'could have sold' " their shares of the defendant's stock on the open market " ' "without depressing th[at] market" ' " during that time period if the defendants had not breached the agreement. (*Comrie,* at p. 20.) In so doing, the court fulfilled the reasonable expectations of the plaintiffs at the time of breach and resolved any uncertainties in their "favor." (*Id.* at p. 19.)

**[17]    [18]**  Like California law (see *Brandon & Tibbs, supra,* 226 Cal.App.3d at p. 455, 277 Cal.Rptr. 40 ["The aim is to put the injured party in as good as a position as he would have been had performance been rendered as promised"]), Delaware law applies the "principle of expectation damages" in breach of contract actions and **\*197** measures those damages "by the amount of money that would put the promisee in the same position as if the promisor had performed the contract" (*Duncan, supra,* 775 A.2d at p. 1022). And like California law—which permits recovery of any damages that "might have been reasonably contemplated or foreseen by both parties at the time they made the contract" (*Brandon & Tibbs,* at pp. 455–456, 277 Cal.Rptr. 40)—Delaware law focuses on the "reasonable expectations of the parties *ex ante*" in determining damages for breach of contract (*Duncan,* at p. 1022).

**[19]**  Moreover, consistent with *Bertero,* Delaware courts consider the equities in determining the proper measure of damages in breach of contract actions involving lost stock options (compare *Bertero, supra,* 254 Cal.App.2d at p. 147, 62 Cal.Rptr. 714 with *American General, supra,* 622 A.2d at p. 7), including "events occurring up to the time of judgment" (compare *Bertero,* at p. 150, 62 Cal.Rptr. 714 with *Comrie, supra,* 837 A.2d at p. 20). Further, the Delaware courts in *Duncan, supra,* 775 A.2d at page 1023, *American General, supra,* 622 A.2d at page 1, and *Comrie, supra,* 837 A.2d at page 20, have applied the same legal principle applied in *Bertero,* at page 151, 62 Cal.Rptr. 714: " 'One whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness.' " Because of these similarities between California and Delaware law, the same reasoning used by this court to reject Skillz's argument that Shah's damages should be measured as of the date of breach under California law may also be used to reject that argument under Delaware law. (See, *supra,* at pp. 192–93.)

Indeed, our ruling under California law is narrower in scope than the rulings made by our judicial colleagues in Delaware, who have held that a conversion theory of damages, i.e., the New York Rule, applies in every breach of contract action involving stocks or stock options. Because Skillz only challenges the remittitur on the ground that Shah's damages should be calculated as of the date of breach and because neither party challenges the formula used by the trial court to calculate damages once the valuation date has been set, we need not decide whether and when a conversion formula applies in breach of contract actions under California law. [18]

[18]    Neither party has ever challenged the remittitur's use of the average price of Skillz stock over a particular time period to calculate Shah's damages. Accordingly, they have forfeited any such challenge. (See *Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 970, fn. 7, 150 Cal.Rptr.3d 385 [failure to make argument on appeal forfeits it].)

Finally, at oral argument, Skillz argued that this court should remand for a new trial on damages if it applies Delaware law because Skillz would have presented additional evidence at trial had it known that Delaware, rather than California, law might govern. Of course, this argument is now moot because we reject Skillz's arguments under both

California and Delaware law. Moreover, Skillz waived its remand argument by conceding that Delaware law governed Shah's stock options in its reply brief (see *Martin v. PacifiCare of California* (2011) 198 Cal.App.4th 1390, 1410, 130 Cal.Rptr.3d 714 [by conceding preemption, the plaintiffs waived any preemption "contention"]) and forfeited that argument by failing to raise it in its supplemental brief (see *Vaughn v. Tesla, Inc* (2023) 87 Cal.App.5th 208, 228, 303 Cal.Rptr.3d 457 [the defendant forfeited any argument raised "for the first time at oral argument"].)

**\*198**  In any event, there is no reason to believe that Skillz would have acted any differently if it believed that Delaware law applied. Despite its assertion that California law is clear and requires that damages be measured from the date of breach, Skillz presented through expert testimony an alternative calculation of Shah's damages using a different valuation date—the date the lock-up period ended. Thus, Skillz contemplated the possibility that Shah's damages may be measured from a date other than the date of breach under California law. Yet, Skillz chose not to present an alternative calculation using the value of Skillz stock in the secondary markets even though it presented evidence of those values at trial. More notably, Skillz does not explain how the parties' reliance on California law at trial prevented Skillz from presenting that alternative calculation or additional supporting evidence to the jury especially in light of the California cases discussed above.

Accordingly, we reject Skillz's challenges to the remittitur under Delaware law as well.

### 2. *Shah's Challenge to the Measure of Damages Adopted by the Trial Court in the Remittitur*

In his cross-appeal, Shah argues that the jury's verdict should be reinstated because the amount of the remittitur "lacks substantive support." According to Shah, the trial court, "by choosing between the experts' valuation of" his damages, agreed that "post-IPO-sale damages were proper." Then, in a leap of logic that is hard to follow, he contends the court could not have found "excessive damages" and should not have rejected the measure of damages adopted by the jury.

**[20]**  But the measure of damages was a question of law to be decided by the court. (*Toscano, supra,* 124 Cal.App.4th at p. 691, 21 Cal.Rptr.3d 732.) And the trial court, by adopting the alternative calculation proffered by Skillz's expert, instead

of the calculation proffered by Shah's expert and adopted by the jury, necessarily concluded that the jury verdict was excessive because it: (1) erroneously assumed that Shah would have sold 18.9 percent of his shares at the early release; and (2) erroneously used the average price of Skillz stock over a two-week period after the lock-up period ended to calculate Shah's damages. Shah does not explain how the court erred by reaching these conclusions. Indeed, Shah never argues that those conclusions were erroneous. As explained above, the measure of damages adopted by the court in the remittitur comports with both California law and Delaware law. (See, *supra,* at p. 187.) Accordingly, we reject this challenge to the remittitur made by Shah and affirm the court's adoption of the approach taken by Skillz's expert.

### D. The Trial Court's Exclusion of Damages for Breach of the Performance Grant in the Remittitur

In his last challenge to the remittitur, Shah contends the trial court erred by excluding damages for breach of the Performance Grant (the third contract). To justify this reduction in Shah's damage award, the court referenced Skillz's argument that Shah did not "properly" plead a breach of this third contract. In that argument, Skillz claimed that Shah could not recover damages for breach of the Performance Grant because the FAC "failed to apprise Skillz of a need to prepare a defense as to breach of the [Performance Grant] and that [this] failure affected Skillz's substantial rights." We disagree. [19]

[19]    Because we find that the trial court erred by excluding these damages, we do not address Shah's argument that the court lacked jurisdiction under section 660 to amend the remittitur to exclude them.

**\*199**  **[21]**  **[22]**  "No error or defect in a pleading is to be regarded unless it affects substantial rights." (*Buxbom v. Smith* (1944) 23 Cal.2d 535, 542, 145 P.2d 305.) "The primary function of a pleading is to give the other party notice so that it may prepare its case [citation], and a defect in a pleading that otherwise properly notifies a party cannot be said to affect substantial rights." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 240, 152 Cal.Rptr.3d 392, 294 P.3d 49.)

**[23]**  Here, the FAC notified Skillz that the stock options awarded under the Performance Grant were at issue even though the FAC did not attach the Performance Grant as an exhibit or expressly allege a breach of that contract. In

the breach of contract cause of action, the FAC alleged that Shah entered into the Employment Contract—which awarded Shah 69,487 stock options as memorialized in the Notice. It then alleged that Shah's compensation under the Employment Contract was "adjusted" through an award of additional stock options under the Performance Grant and that, by depriving him of those additional options, Skillz breached both the Employment Contract and the Notice. Finally, the FAC expressly sought "[r]estoration of [ ] Shah's vested options to purchase 30,000 shares of Skillz [ ] granted pursuant to the Performance Grant." Read together, these allegations provided more than sufficient notice to Skillz that Shah was seeking damages for breach of the Performance Grant.

In any event, Skillz does not appear to argue that any deficiencies in the FAC prevented it from preparing and presenting its defense to Shah's claim for breach of the Performance Grant. Nor could it. At trial, Skillz did not object to the admission of the Performance Grant into evidence, and various witnesses testified without objection about that contract during trial. Indeed, Skillz's own expert accounted for the value of the Performance Grant options in his damage calculations. And most notably, Skillz's counsel conceded after the close of evidence that the Performance Grant was at issue: "I'm not arguing that these performance grants are not in the case. I believe that, if the jury were to reach a verdict for plaintiff, there could include a damage award for the grants."

Finally, to the extent that the FAC failed to expressly allege a breach of the Performance Grant, this omission is immaterial because the Performance Grant "alter[ed] the terms" of the Employment Contract. As Skillz concedes in its supplemental brief, "[t]hat means that the Employment Contract, if breached, is breached as altered." Therefore, by alleging a breach of the Employment Contract *as altered*, the FAC necessarily alleged a breach of the Performance Grant. Thus, any defect in the FAC could not have affected Skillz's substantial rights, and the trial court abused its discretion by excluding damages for the breach of the Performance Grant in its amended remittitur. (See *Dell'Oca v. Bank of New York Trust Co., N.A.* (2008) 159 Cal.App.4th 531, 547, 71 Cal.Rptr.3d 737 ["a reduction in the amount of damages as a condition of denying" a new trial motion may be reversed if "it plainly appears the court has abused its discretion"].)

E. Stock Options Are Not Wages Under the Labor Code.

**[24]** In the last argument of his cross-appeal, Shah contends we should reverse **\*200** the trial court's directed verdict dismissing his tort claims for retaliation and wrongful termination. According to Shah, the court erred when it concluded that stock options are not "wages" under the Labor Code. Shah therefore requests that we remand these claims for a new trial so he may pursue "tort damages, including punitive damages and attorneys' fees." We review de novo a directed verdict and find no error here. (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210, 77 Cal.Rptr.2d 660.)

Shah acknowledges that his tort claims fail if stock options are not "wages" under the Labor Code. That Code defines "wages" as "all *amounts* for labor performed by employees of every description, whether the amount is *fixed or ascertained* by the standard of time, task, piece, commission basis, or other method of calculation." (*Lab. Code, § 200, subd. (a)*, italics added.) It then makes it "unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." (*Id.*, *§ 221*.)

**[25]  [26]** We agree with Skillz that stock options are not wages because they "are not 'amounts.' They are not money at all. They are contractual rights to buy shares of stock." (*International Business Machines Corp. v. Bajorek* (9th Cir. 1999) 191 F.3d 1033, 1039 (*IBM*); see *Falkowski v. Imation Corp.* (9th Cir. 2002) 309 F.3d 1123 [stock " 'options are not "wages" ' " under [the Labor Code's] definition of the term 'wages' "].) This conclusion comports with the purpose behind Labor Code section 221. As the Ninth Circuit explained in *IBM*, "[t]he amount of money for which the shares can be sold on the market varies unpredictably from time to time, so it is not 'fixed or ascertainable' by any method of calculation when the agreements are made or exercised." (*Ibid.*) Thus, the purposes behind Labor Code section 221 of "avoiding secret kickbacks enabling an employer to avoid minimum wage laws" and "protecting employees' reliance interests in their expected wages, do not apply to stock options." (*IBM, at p. 1039.*)

Shah counters with *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 101 Cal.Rptr.3d 2, 218 P.3d 262 (*Schachter*)

*Shah v. Skillz Inc.*, 101 Cal.App.5th 285 (2024)

320 Cal.Rptr.3d 175, 2024 Daily Journal D.A.R. 3094

and claims that *Schachter* "settled the issue" that "all 'compensation,' including 'incentive compensation' like stock options, is wages." We disagree. *Schachter* did not involve stock options; it involved shares of restricted stock under an employer's incentive compensation plan. (*Id.* at p. 614, 101 Cal.Rptr.3d 2, 218 P.3d 262.) The employee in *Schachter* elected to receive, in lieu of cash payment, a percentage of his annual compensation in the form of restricted stock shares. (*Ibid.*) The plan provided that the shares were subject to a two-year vesting period and that the employee forfeited these shares if he or she resigned or was terminated for cause before the end of that two-year period. (*Id.* at p. 615, 101 Cal.Rptr.3d 2, 218 P.3d 262.)

The main issue in *Schachter* was whether the employee's unvested shares constituted "earned wages" making their forfeiture following the employee's resignation a violation of Labor Code sections 201 and 202. (*Schachter, supra,* 47 Cal.4th at pp. 618–619, 101 Cal.Rptr.3d 2, 218 P.3d 262.) As a threshold matter, our Supreme Court stated that incentive compensation including restricted stock constituted wages—which the employer did not dispute. (*Ibid.*) The court then held that because the employee agreed to the terms of the vesting schedule, "the Plan's forfeiture provision [did] not run afoul of [Labor Code] sections 201 or 202 because no earned wages remain unpaid upon termination for cause **\*201** or resignation." (*Id.* at p. 623, 101 Cal.Rptr.3d 2, 218 P.3d 262.)

*Schachter*'s dicta that restricted stock are wages does not mean that stock options should also be considered wages. Restricted stock shares have an ascertainable value and are immediately issued to the employee (subject to certain restrictions on their sale). (See *Schachter, supra,* 47 Cal.4th at p. 614, 101 Cal.Rptr.3d 2, 218 P.3d 262.) By contrast, stock options merely grant the holder a contractual right to buy shares of stock at a later date at an agreed upon exercise price. Whether and when the holder chooses to exercise these options and what the market value of the stock will be at some future date at the time the holder chooses to exercise the options are unknown and undeterminable at the time of the grant. While we recognize that companies,

especially startups like Skillz, often award stock options to incentivize employees to join and stay with the company for less cash pay, this does not make them "wages" under the Labor Code because those wages must be fixed or ascertainable "amounts." (Lab. Code, § 200, subd. (a); see also *Walter v. Adaptive Insights, Inc.* (N.D.Cal. May 23, 2019) 2019 WL 13201941, \*2, 2019 U.S.Dist. Lexis 243550, \*3–\*4 [*Schachter* did not supersede *IBM* because it did not "address[ ] stock options" or defin[e] 'wages' under the California Labor Code"].)

By declining to find that stock options are wages under the Labor Code, we do not leave employees who are wrongfully denied their options without recourse. For example, those employees, like Shah, may still pursue a breach of contract claim to recover the value of any options they wrongfully lost. Our ruling only limits their ability to recover tort damages and attorney fees. Accordingly, we affirm the directed verdict for Skillz on Shah's tort claims. And because we do so solely on the ground that stock options are not wages under the Labor Code, we need not address Skillz's argument that Shah cannot establish prejudice.

### III. DISPOSITION

The amended judgment of $4,358,358 is reversed. The matter is remanded to the trial court with directions to enter a new judgment in the amount of $6,694,000, which includes damages for breach of the Performance Grant as calculated by Skillz's expert using the average price of Skillz stock after the lock-up period ended. The judgment is affirmed in all other respects. In the interests of justice, both parties shall bear their own costs. (Cal. Rules of Court, rule 8.891, subd. (a)(4).)

We concur.

SIMONS, Acting P.J.

BURNS, J.

**All Citations**

101 Cal.App.5th 285, 320 Cal.Rptr.3d 175, 2024 Daily Journal D.A.R. 3094

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.