GOPI K. PANCHAPAKESAN (CA SBN 279586)
gpanchapakesan@birdmarella.com
BIRD, MARELLA, RHOW, LICENBERG,
DROOKS & NESSIM, LLP
1875 Century Park East 23rd Floor
Los Angeles, California 90067
Telephone: 310.201.2100
Facsimile: 310.201.2110

ANDREW DITCHFIELD (admitted *pro hac vice*)
BRIAN M. BURNOVSKI (admitted *pro hac vice*)
andrew.ditchfield@davispolk.com
brian.burnovski@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: 212.450.4000
Facsimile: 212.701.5800

Attorneys for Defendants
NICHOLAS HORBACZEWSKI and
DRONE RACING LEAGUE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JUSTICE LAUB and DANIEL KANES,<br><br>Plaintiffs,<br><br>v.<br><br>NICHOLAS HORBACZEWSKI, DRONE RACING LEAGUE, INC., and DOES 1 TO 10,<br><br>Defendants. | Case No. 2:17-CV-06210 JAK (KSx)<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br>Before the Hon. John A. Kronstadt<br>Hearing Date: December 11, 2023<br>Action Filed: July 10, 2017<br>Trial Date: None Set |

## I. INTRODUCTION

Defendants Nicholas Horbaczewski and Drone Racing League, Inc. ("Defendants") submit this Response to Plaintiffs' Notice of Supplemental Authority (Dkt. 621, the "Notice"). The Notice highlights the California Court of Appeal's decision in *Shah v. Skillz Inc.*, 101 Cal. App. 5th 285, 320 Cal. Rptr. 3d 175 (2024), which Plaintiffs argue supports their Opposition (Dkt. 305) to Defendants' Motion to Exclude the Expert Report and Testimony of Greg J. Regan (the "Motion to Exclude") (Dkt. 225). Plaintiffs are wrong.

*Shah* does nothing to save Mr. Regan's opinions, which, among other flaws, improperly purported to measure Plaintiffs' damages as of trial (which, at this point, will be nearly a decade or more after the alleged breach). Rather, *Shah* simply held that (1) damages need not invariably be measured as of the time of breach and that (2) in light of the facts and equities, damages in that particular case were properly measured using the price of the company's stock after the company (plaintiff's former employer) had gone public and after the plaintiff's lock-up period expired, when a readily available market for the stock existed. Based on that holding, Plaintiffs argue that their own damages should be based on DRL's valuation, as reflected in the announced acquisition of the Company by Infinite Reality in a stock-for-stock merger—i.e., $250 million. Notably, that is *not* the measure of damages ever previously advocated by Plaintiffs or the measure of damages used by Mr. Regan that is subject to the pending Motion to Exclude. Even assuming for the sake of argument that Plaintiffs' reading of *Shah* were correct (it is not), Mr. Regan would need to come up with a *completely new* damages opinion to comport with the decision. On that basis alone, *Shah* is irrelevant to the Motion to Exclude.

In any event, Plaintiffs misread *Shah*. As the California Court of Appeals made clear, its holding regarding the appropriate measure of damages in that case—deviating from the "general rule" that damages are measured at the time of breach—

was predicated on "equitable considerations." *See Shah*, 320 Cal. Rptr. 3d at 188, 189, 191.  As explained further below, no such equitable considerations warrant deviating from the general rule here.  Indeed, consideration of the facts and equities present here only reinforce why measuring damages at or around the time of breach is appropriate.

Accordingly, the Court should adhere to its tentative decision (Dkt. 341 at 4:11-15, 6:17-19) and grant the Motion to Exclude.

## II.  BACKGROUND

On May 15, 2019, Defendants moved to exclude Mr. Regan's damages opinion based on Plaintiffs' alleged "lost opportunity to own DRL stock" on the basis that it rests on a valuation date—i.e., the date of a future hypothetical judgment in Plaintiffs' favor—that is legally flawed and irrelevant.  (Dkt. 223-1 at 6-10; Dkt. 314 at 2-8.)[1]  In connection with his "lost opportunity to own" opinion, Mr. Regan (1) took DRL's per share value as of June 30, 2017, as determined at the time by an outside valuation firm (Anvil Advisors); (2) grew that value at 25% per year through August 31, 2019 (the then-estimated date of judgment); (3) made certain adjustments to update the discount for lack of marketability as of the new valuation date; and (4) multiplied the result by the number of DRL shares to which Plaintiffs are purportedly entitled (i.e., two-thirds of Mr. Horbaczewski's shares at that time).  Dkt. 223-1 at 2-4; Dkt. 223-2 ¶¶ 66-72 & Schedules 1 & 2.[2]

---

[1] Defendants also moved to exclude Mr. Regan's other opinions as well. Specifically, Defendants moved to exclude his opinion on Plaintiffs' purported "lost opportunity to sell DRL common stock" on the basis that it consisted of nothing more than basic arithmetic and was not proper expert testimony, Dkt. 223-1 at 10-11, and moved to exclude his opinion regarding "increased tax obligations" on the basis that it was derivative of his improper valuation opinions and consisted of improper legal conclusions, *id.* at 11-12.

[2] Notably, based on Mr. Regan's methodology, Plaintiffs' damages would continue to grow in perpetuity at a 25% rate for as long as this case continues—resulting in damages being improperly based on the vagaries of how long this

1. In opposing the Motion to Exclude at the time, Plaintiffs relied on a single unpublished decision, *Bedrosian v. Tenet Healthcare Corp.*, 2003 WL 22435654, at *7 (Cal. App. Oct. 28, 2003), which they argued stood for the proposition that in California, in an action for breach of contract to convey stock, "a prevailing plaintiff is entitled to recover 'the stock's highest market value' at trial so long as the plaintiff did not 'deliberately delay in bringing an action . . . in the hope that the share price might go up.'" Dkt. 285-1 at 8.

On July 15, 2019, the Court heard argument on the Motion to Exclude. During that hearing, the Court expressed the tentative opinion that the valuation date used in Mr. Regan's damages opinion was improper, as "the time to measure damages is not as of trial" and that his opinion should be excluded on that basis. Dkt. 341 at 4:11-15, 6:17-19.

On April 23, 2024, Infinite Reality announced that it had agreed to acquire DRL in a stock-for-stock merger that values DRL at $250 million. Dkt. 625 ¶ 2.

On May 7, 2024, Plaintiffs filed the Notice, arguing that *Shah* "conclusively shows that Defendants' Motion to Exclude Mr. Regan must be denied." Dkt. 621 at 3. Plaintiffs argue that, based on *Shah*, damages should be measured based on DRL's valuation in the Infinite Reality merger—a different measure than Plaintiffs previously espoused, based on *Bedrosian*, and a different measure than that employed by Mr. Regan. *Id.*; *see also* Dkt. 285-1 at 8; Dkt. 223-2 ¶¶ 66-72.

## III.   ARGUMENT

Contrary to Plaintiffs' contention, nothing in *Shah* warrants the Court revisiting its tentative decision to grant the Motion to Exclude.

### A.   *Shah* Is Irrelevant to the Motion to Exclude

As an initial matter, *Shah* is irrelevant to the Motion to Exclude because the litigation lasts and other factors and subsequent events that have nothing to do with the alleged contract breaches at issue. Dkt. 225-1 at 1, 6-10.

1   measure of damages set forth in that case is not the measure of damages that Mr.
2   Regan purports to offer in his damages opinion.  *See* Dkt. 223-2 ¶¶ 66-72.  According
3   to Plaintiffs, *Shah* stands for the proposition that the proper measure of damages for
4   breach of a contract to convey stock in a startup company with no available market
5   for the stock as of the time of breach is "the 'highest intermediate price of the
6   defendants' stock' between the 'date of breach' and the first date when a readily
7   available market exists"—i.e., when the startup undergoes an IPO or is sold to
8   another company.  Dkt. 621 at 3.  According to Plaintiffs, that purported rule requires
9   the Court to deny the Motion to Exclude and mandates that Plaintiffs' damages must
10  be measured "By the Market Value Established by Infinite Reality's Recent Deal to
11  Purchase DRL."  *Id.* at 5.  In other words, Plaintiffs now appear to be claiming for
12  the first time—nearly seven years into this litigation—that they are entitled to two-
13  thirds of the value of DRL, as valued in the Infinite Reality transaction, or
14  approximately $167 million.
15      But DRL's valuation in the Infinite Reality transaction bears no relationship, in
16  either methodology or amount, to the damages calculated by Mr. Regan or previously
17  advocated by Plaintiffs.  Accordingly, even if Plaintiffs' reading of *Shah* were correct
18  (it is not), it would supply no basis to justify Mr. Regan's opinions, which are based
19  entirely on a valuation of DRL in 2017—well before the contemplated acquisition by
20  Infinite Reality (or the existence of any public market for DRL's shares)—and then
21  simply grown, subject to certain minor adjustments, at a 25% rate of return through
22  the date of judgment.  Put differently, if Plaintiffs' flawed interpretation of *Shah* were
23  accepted, the damages opinion previously espoused by Mr. Regan would no longer
24  be relevant, and he would need to offer a completely new opinion, based on an
25  entirely different methodology and entirely different calculations.  Plaintiffs should
26  not be afforded another bite at the apple at this late stage of the litigation simply
27  because in the intervening *five years* since expert discovery closed, DRL is poised to
28

enter into a sale transaction from which Plaintiffs believe they can reap a windfall.[3]

### B.     *Shah* Does Not Change the Relevant Measure of Contract Damages Applicable in This Case

In any event, Plaintiffs' reading of *Shah*, based on cherry-picked language from the opinion, is flawed.  Far from setting out some new measure of damages that applies to every claim for breach of a contract to convey stock in a private startup, Dkt. 621 at 3, the decision reaffirmed the "general rule" that "damages in breach of contract actions . . . should be measured from the date of breach," while acknowledging that damages can sometimes be "measured as of a date other than the date of breach *based on equitable considerations*."  *Shah*, 320 Cal. Rptr. 3d at 189 (emphasis added); *see also id.* at 191 (acknowledging that, in *Peek v. Steinberg*, 163 Cal. 127, 124 P. 834 (1912), the California Supreme Court held that "[t]he measure for the failure to issue the stock would [be] the actual value of the stock at the time when [the plaintiff] should have received it," but noting that, "in reaching this conclusion, our high court did not consider the equities" or subsequent events "because the parties apparently presented none").

Consistent with that general holding, the facts and equities in *Shah* were critical to the court's ultimate decision to reject a damages measure as of the time of breach in that case.  The plaintiff there—a former employee of the defendant—had agreed to accept lower-than-market salary on the promise that he could participate in the potential financial upside of the company, a startup that was founded in 2012, through a grant of stock options that would vest over time.  *Shah*, 320 Cal. Rpt. 3d at

---

[3] That *Shah* was not decided until recently does not alter that conclusion. Plaintiffs and Mr. Regan were free to take the position during expert discovery that damages for breach of a contract to convey stock should be measured based when a market for the stock first becomes available, based on the decades-old case law cited in *Shah*.  *See, e.g.*, *Shah*, 320 Cal. Rptr. 3d at 188-89 (citing *Sackett v. Spindler*, 248 Cal. App. 2d 220, 235-36, 56 Cal. Rptr. 435 (1967); *Bertero v. Nat'l General Corp.*, 254 Cal. App. 2d 126, 141, 62 Cal. Rptr. 714 (1967)).

180-82. The plaintiff was hired by the company in 2015 and, through 2018, worked as a full-time employee, helping the company achieve growth and success in the leadup to its 2020 IPO. *Id.* at 180-83. During his tenure as an employee, a substantial portion of his stock options had vested. *Id.* at 183 n.5. Yet prior to the IPO, the defendant fired the plaintiff for pretextual reasons, with the aim of depriving him of the value of any of those options. *Id.* at 180. Moreover, because the company's stock was not publicly traded at the time of his termination, the plaintiff had no "ability to 'cover,' in other words, [to] mitigate damages by protecting prospective profit, by *entering the market* to purchase the lost shares," a fundamental premise underlying the contract theory of damages. *Shah*, 320 Cal. Rptr. 3d at 190.

Based on these facts, the court held that measuring damages as of the date of breach would be inequitable. The court held that doing so would "ignore[] what was 'reasonably contemplated'" by the parties at the time of the option grant, including that the plaintiff would accept stock options in lieu of market-rate salary on the expectation that he would have the opportunity to benefit from the financial upside of his vested options at the time of an IPO. *Id.* at 192.[4] Accordingly, the court held that equity justified departing from the general rule of measuring damages at the time of breach and that damages should be based on the company's post-IPO stock price after the expiration of an applicable lock-up period—when the plaintiff would have first been permitted to sell stock without restriction. *Id.* at 193. The court found that this result, which was consistent with the premise under which the parties operated throughout the plaintiffs' employment (i.e., that the plaintiff would have an opportunity to sell after there was a public market for the stock), was most consistent

---

[4] The court noted that the "primary value of stock options like the ones granted to [the plaintiff] lies with the ability to cash out those options if the company is successful and goes public" in an IPO, which the company did in December 2020. *Id.* at 179-80.

with the parties' bargain. *Id.*[5]

The facts and equities in this case do not merit the same conclusion. Among other things:

- Unlike in *Shah*, where the plaintiff accepted options in exchange for below-market salary and worked for years while those options vested, Plaintiffs never worked a day at DRL.

- The company in *Shah* had been founded six years before the plaintiff's termination and was on a foreseeable path to an IPO at the time of the firing. By contrast, at the time of the alleged breach here—on or around April 17, 2015, when Mr. Horbaczewski unilaterally incorporated DRL without providing Plaintiffs equity in the Company (Dkt. 223-1 at 2)—DRL was little more than a nascent business idea and had no real business operations to speak of.

- Whereas the plaintiff in *Shah* could not readily "cover" to mitigate damages, given the absence of a market for the defendant's stock, *Shah*, 320 Cal. Rptr. 3d at 190, Plaintiffs here did not face the same hurdle. To be sure, like the defendant in *Shah*, DRL was a private company with no market for its stock. But unlike the entity in *Shah*, which had been in business for years and had developed a fully functional online gaming platform for mobile devices, DRL had no material operations or assets. Accordingly, Plaintiffs could "cover" (i.e., mitigate their losses) simply by forming their own entity and pursuing their own business based on their purportedly valuable ideas and insights.

Measuring damages based on the value of DRL in the Infinite Reality deal would not afford Plaintiffs what they and Mr. Horbaczewski purportedly bargained for in March 2015, but rather, would allow Plaintiffs to reap an undeserved windfall—benefitting from DRL's substantial appreciation in value, without bearing any risk or expense, based entirely on events that long post-dated their involvement in the company and the unfortunate length of pretrial proceedings. It would also

---

[5] The defendant argued that the plaintiff could, and would, have sold stock in available secondary markets prior to the IPO, but the Court held that the defendant did not make that argument at trial, and therefore forfeited it, and, in any event, the argument was belied by the evidence at trial. *Id.* at 193.

result in damages that are unduly speculative, insofar as they would be premised on the implicit and flawed assumption that, had Plaintiffs held a controlling interest in DRL since March 2015, DRL's business and value would have developed and grown exactly the same as it did in their absence.  That is precisely why damages are generally measured as of the time of breach and should be measured as such here.  *See* Dkt. 223-1 at 7-8 (citing, *inter alia*, *Kearl v. Rausser*, 293 F. App'x 592, 605 (10th Cir. 2008) (Gorsuch, J.) (post-breach measure of damages improperly "allows a plaintiff to ride the stock market at the defendant's risk and expense until trial or until the defendant sold, which might not take place until years later, in effect transforming defendant into a surety against any intervening loss of value unrelated to the transactions at issue in the case at hand"); *Kovens v. Paul*, 2009 WL 562280, at *4, 5 (S.D.N.Y. Mar. 4, 2009) (date-of-breach rule "avoids exposing parties to a potentially limitless range of liability that depends on the vagaries of the stock market, unrelated developments in the company at issue, and the duration of pretrial practice in ensuing litigation" and damages that are unduly speculative)).

Over the past nine years since Plaintiffs parted ways with Mr. Horbaczewski, DRL has grown from a nascent startup to a business valued at $250 million.  During that time, Plaintiffs contributed absolutely nothing—zero—to the Company's development and growth, its commercial relationships, its fundraising rounds to support its operations, or the pending merger transaction from which Plaintiffs now seek to reap a windfall.  Plaintiffs' contention that they should nonetheless be entitled to damages in the amount of two-thirds of $250 million for sitting by idly while Mr. Horbaczewski and DRL's many employees worked tirelessly to build the business is frivolous.  Such a result would not serve any "equitable considerations," as contemplated by *Shah*.  Rather, it would be an *affront* to equity.  This Court should not countenance such a result.[6]

---

[6] As Defendants explained in their opposition to Plaintiffs' recent application for a TRO (Dkt. 625-1 at 16), Mr. Horbaczewski himself currently owns less than

### C. *Shah* Has No Bearing on Plaintiffs' Claimed Tort Damages

As to their tort claims, Plaintiffs argue that *Shah* likewise supports a measure of conversion damages under Section 3336 of the California Civil Code using a valuation of DRL stock after the alleged breach. *See* Dkt. 621 at 9. Plaintiffs are, once again, mistaken.

Putting aside that Plaintiffs have not alleged a claim for conversion and, accordingly, Section 3336 is simply irrelevant (*see* Dkt. 314 at 4-5), Plaintiffs misconstrue the statute for reasons previously articulated (*see, e.g., id.* at 5-8). *Shah* did not address, much less purport to interpret Section 3336 and, thus, has no relevance to the parties' arguments with respect to that statute.

## IV. CONCLUSION

For the foregoing reasons, *Shah* does not support Mr. Regan's measure of damages or supply any basis to deny the Motion to Exclude. Defendants respectfully submit that the Court should adhere to its tentative ruling on July 15, 2019, and grant the motion.

Dated: May 21, 2024

DAVIS POLK & WARDWELL LLP

/s/ Andrew Ditchfield
Andrew Ditchfield

*Attorneys for Defendants*
NICHOLAS HORBACZEWSKI and
DRONE RACING LEAGUE, INC.

---

20% of DRL's equity—a stake that would be worth a fraction of the damages to which Plaintiffs now claim entitlement under *Shah*. In that context, Plaintiffs' proposed damages measure is simply nonsensical.